O. W. SHEPHERD *et al., Appellants,* v. THE CITY OF KANSAS CITY *et al., Appellees.*

No. 16,214.

SYLLABUS BY THE COURT.

1. CURATIVE ACT—*Unauthorized Act of Municipal Corporation —Legislative Powers.* A curative act of the legislature may validate and legalize any act of the corporate authorities of a municipality in the state, provided only that the legislature had the power under the constitution to authorize the municipal act in the first instance.

2. TAXATION — *Special Assessment — Curative Act — Property "Liable" for Assessment.* The qualifying phrase, "and against the property liable for assessment for such improvement at the time of the making thereof," in section 129 of chapter 122 of the Laws of 1903, means the property which would have been liable for the special assessment had no infirmity existed therein or in the steps leading thereto, which infirmity this section was enacted to cure by the terms thereof.

3. ——— *Invalid Assessment Enjoined — Reassessment — Res Judicata*. The judgment of the court of common pleas of Wyandotte county perpetually enjoining the city of Kansas City, Kan., from the collection of an assessment under a former ordinance is not *res judicata* of the question here involved,. which is the validity of an assessment under a different and subsequent ordinance.

Appeal from Wyandotte court of common pleas; WILLIAM G. HOLT, judge. Opinion filed December 11, 1909. Affirmed.

*James F. Getty*, *F. D. Hutchings*, and *David F. Carson*, for the appellants.

*J. W. Dana*, and *T. A. Pollock*, for the appellees.

The opinion of the court was delivered by

SMITH, J.: South Jersey creek runs from the west in an easterly direction along the northern part of Kansas City, Kan. In dry weather there is a very light flow of water in it. In 1887 the mayor and council of Kansas City, Kan., by ordinance established sewer district No. 3, and by another ordinance made provision for the construction of a sewer therein, running nearly north and emptying into this creek. In 1890 sewer district No. 14 was established, and in the same ordinance provision was made for the construction of a sewer also running from the south into this creek. In 1894 the city established sewer district No. 16, and afterward made provision by ordinance for the construction of a sewer running north, parallel with the others from the south, and emptying into South Jersey creek.

In 1902, the flow of water in the creek having proved insufficient properly to carry off the sewage, the city by ordinance created the South Jersey creek intercepting sewer district. This district included some territory farther west than either of the other districts, and a part of districts numbered 3 and 14 and

all of district No. 16. Afterward the city by ordinance made provision for the construction of a sewer in this district, called the South Jersey creek intercepting sewer, which started in the new territory west and ran in an easterly direction, practically parallel with South Jersey creek, across the sewers in districts numbered 3, 14 and 16, and eventually discharged into the Missouri river. The sewers in districts numbered 3, 14 and 16, as constructed, were large sewers, and the sewer constructed across them was much smaller, and a dam fifteen or twenty inches high, at the north wall of the intercepting sewer where it crossed the other sewers, was made, so that the ordinary flow of sewage from each of the other main sewers was intercepted and would flow down the intercepting sewer to the river. But when the sewers were flushed by high water the water would overflow the low dam, and a portion of it would flow on to South Jersey creek and a portion follow the intercepting sewer to the river.

By ordinance the city apportioned the cost of the intercepting sewer to property in the territory west previously without sewerage, and to the property in the parts of districts numbered 3 and 14 included in the intercepting sewer district and to all the property of district No. 16, to raise a sinking fund to pay off the bonds of the city out of the proceeds of the sale of which the intercepting sewer had been built.

The appellants, owning property in districts numbered 3, 14 and 16 affected by the levy, brought suit in the common pleas court of Wyandotte county to enjoin the collection of the levy, and in that court obtained a final judgment perpetually enjoining such collection. That judgment stands unreversed and unappealed from. It was rendered on December 5, 1903. At the time the intercepting sewer was made and the first levy for the cost thereof assessed against the prop-

erty of the appellants, section 740 of the General Statutes of 1901 was in force. It read as follows:

"The mayor and council shall have power to provide for a system of sewerage and drainage for the city, or any part thereof, and to build and construct sewers or drains by districts or otherwise, as the mayor and council may designate. The cost and expense of constructing the same shall be assessed against the lots or pieces of ground contained in the district in which the same is situated, and the cost of same shall be levied and collected as one tax in addition to other taxes and assessments, and shall be certified by the city clerk to the county clerk, to be placed on the tax roll for collection, subject to the same penalties and collected in like manner as other taxes, as provided by law: provided, that where any property has paid its full proportion for general sewers and drains in one district, it shall not be transferred to any other [and] made liable for taxation for sewers and drains therein."

The appellants contend that by the passage of the ordinance creating the South Jersey creek intercepting sewer district the city attempted to transfer their property to the new district, and that it was expressly prohibited from so doing by this statute. The word "transferred" in this statute seems to imply the taking of property out of one district in which it has paid assessments for general sewers and drains and putting it into another district, and prohibits the doubling up of assessments against one piece of property in this way. In the present case, however, the property was not taken out of the old districts, but a new and auxiliary district was overlapped upon them for the purpose of perfecting the sewerage in those districts. It does not seem to be such a transference as comes within the spirit, at least, of the prohibition in that act. May not the city have constructed the intercepting sewer successively across sewer districts numbered 3, 14 and 16 for the purpose of serving those districts respectively, and assessed the cost to the property in each district or such portion of the property as in the judgment of the

council was benefited by the improvement, and still have been within the letter of the statute? Probably this method would have been more expensive to the appellants and was regarded by the council as inequitable. That the intercepting sewer was not a benefit to the property specifically assessed is not contended. The council apparently acted within the spirit if not within the letter of the law. However this may be, section 129 of chapter 122 of the Laws of 1903 is a curative act. It reads as follows:

"In case the mayor and council of any city shall have heretofore levied or shall hereafter levy any special assessment for any public improvement in said city, which special assessments are or may be informal, illegal, irregular, or void for the want of sufficient authority to make or levy the same, or for any cause whatsoever, the mayor and council of such city may at any time relevy any such special assessments in the manner provided, and against the property liable for assessment for such improvement at the time of the making thereof; provided, that in all cases where informal, illegal, irregular or void special assessments levied for any improvement against any lot or piece of land shall have been paid, in whole or in part, such lot or piece of land shall not be reassessed for the assessment or the part thereof so paid."

It is contended by the appellees that this section authorizes a relevy of any assessment for public improvements by the city and cures any defect or illegality of any kind whatsoever; in other words, that it validates and ratifies any act of the city which for want of jurisdiction or for any other cause has been improvidently or illegally exercised, excepting only such acts as the legislature could not in the first instance have authorized the city to perform.

But again it is urged by the appellants that the relevy authorized by the section last quoted could be relevied only against the property liable for assessment for such improvement at the time of the making

thereof, and they construe the word "liable" in the latter clause to mean legally liable. This construction would take away the entire force of the curative act. If the property was legally liable for assessment at the time the improvement was made, and the assessment was legally made, no curative act was necessary. But this act undertakes to cure all assessments for public improvements in cities to which it is applicable "which special assessments are or may be informal, illegal, irregular or void for the want of sufficient authority to make or levy the same, or for any cause whatsoever." We think the word "liable" in this clause, "the mayor and council of such city may at any time relevy any such special assessments in the manner provided, and against the property liable for assessment for such improvement at the time of the making thereof," applies to property that would be liable if none of the infirmities before specified in the section had existed. Otherwise, the section has little force or effect.

Numerous questions are raised in this case, not to mention the motion of the appellees to dismiss and the want of a motion for a new trial, which we have decided to pass and to decide the principal question involved. The appellants, however, say in their brief:

"This case involves substantially but one question: Does the reassessment law of 1903 absolutely do away with the necessity of a city of the first class in this state in the first instance having any statutory right or authority to construct a public improvement and to levy special assessments therefor? In other words, can a city of the first class construct any public improvement which it sees fit, and levy special assessments therefor, although not authorized by statute, and after the courts have enjoined such special assessments make a valid relevy of such special assessments. If the city does not have such authority, then this case should be reversed."

The legislature has power to ratify and legalize any

Shepherd v. Kansas City.

act of the legislative body of a city in the state which the legislature under the constitution could have authorized in the first instance. This appears to be just what the legislature of this state has done in section 129 of chapter 122 of the Laws of 1903. There can be no question of the power of the legislature to authorize the city to create the South Jersey creek intercepting sewer district, to provide for the construction of the sewer therein, and to make assessments upon the property in question to raise money to discharge the cost thereof, as it in fact did. Hence, we hold that the curative act ratified and legalized all of the acts of the city, although such acts were illegal or not authorized by law at the time they were done or enacted.

Again, it is contended that the judgment of the common pleas court granting a perpetual injunction against the collection of taxes under the former assessment is *res judicata* of the issue in this case. This contention is fully disposed of in *Kansas City v. Silver,* 74 Kan. 851, and in *Haggart v. Kansas City,* 77 Kan. 798, adversely to the contention of the appellants. The courts have no power to enjoin the future exercise of the legislative power conferred by law upon the mayor and council of a city, nor to prescribe in what manner such power may be exercised. The former action determined the validity of a certain ordinance. This action involves the validity of another and subsequent ordinance, and the decision in the former case is not *res judicata.*

We adopt the statement of the appellants as to the determining question involved, viz., the effect of the reassessment act of 1903, and hold that it authorized the reassessment involved in this case.

The judgment of the court is affirmed.