No. 24,337.

L. B. WARE, *Appellee*, v. THE CITY OF WICHITA, *Appellant*.

No. 24,542.

THE CITY OF WICHITA, *Appellee*, v. L. B. WARE and H. M. WARE, *Appellants*.

SYLLABUS BY THE COURT.

1. MUNICIPAL CORPORATION—*Permit to Erect Business Building in Residential Section—Permit Rescinded by Subsequent City Ordinance.* The fact that an owner of a town lot procured a writ of mandamus requiring a city to grant him a permit to erect a business building in a residential section of the city and an injunction restraining the city from interfering with its erection, which judgments were entered before the city had any ordinance

prohibiting such use of the property, did not prevent the city from enacting
such valid zoning ordinance, nor make it inoperative as to the town lot in
controversy as soon as it was enacted, when the status of the property and
the position of its owner had not been materially changed in the short
interval which elapsed between the entry of the judgments and the adop-
tion of the zoning ordinance.

2. SAME—*Cities May Create Reasonable Zoning Districts and Prohibit Con-
struction of Certain Classes of Buildings Therein.* Under express grants of
legislative power conferred upon cities of the first class having 20,000 inhabi-
tants (Laws 1921, chapters 99 and 100), such cities may plan and create rea-
sonable zoning districts for the future systematic development of the city,
and provide therein for residential, commercial and industrial districts, and
prohibit the construction of buildings at variance with such plan of de-
velopment.

3. SAME—*Ordinance a Valid Exercise of the Police Power.* The city ordinance
in controversy, adopted pursuant to express statutory authority and which
forbids the construction of a business building in a residential district, is a
valid exercise of the police power, and does not violate any provision of state
or federal constitution.

4. SAME—*Chapters 99 and 100 of the Laws of 1921, Relating to the Creation of
Zoning Districts Not Unconstitutional.* Chapter 99 of the Laws of 1921,
which authorizes the creation of city planning commissions in cities of 20,000
population, and chapter 100 of the Laws of 1921, which authorizes such cities
to establish districts or zones within their corporate limits and to regulate
the use of property and the construction of buildings therein, are not un-
constitutional.

Appeals from Sedgwick district court. Division No. 1, THOMAS E. ELCOCK,
judge; case No. 24,337 dismissed. Division No. 2, THORNTON W. SARGENT,
judge; case No. 24,542 affirmed.

*A. V. Roberts, J. N. Haymaker,* and *R. E. Angle,* all of Wichita, for the
appellants *L. B. Ware* and *H. H. Ware.*

*Robert C. Foulston,* and *George Seifkin,* both of Wichita, for the appellee
City of Wichita.

The opinion of the court was delivered by

DAWSON, J.: These appeals relate to the right of an owner of a
town lot to construct a business building thereon in a residential
section of the city of Wichita.

The plaintiff in case No. 24,337, L. B. Ware, owned a town lot on
which he proposed to construct a business building. The lot was lo-
cated in a residential section of the city. Shortly prior to the time
he applied for a permit to construct the building, the city had en-
acted an ordinance creating a city planning commission under au-

thority of chapter 99 of the Laws of 1921, and this commission had embarked on its duties of planning the systematic development of the municipality but its work was not quite ready to be submitted to the city government for consideration and action. But in view of the impending completion of the plan of development, which contemplated the creation of zoning districts within the city and which would bar the construction of a business building on such locations as that of plaintiff's lot, a permit was denied him; and he brought mandamus against the city and its officials to compel the issue of such permit. Plaintiff prevailed in that action, which is one of the appeals brought here for review.

About the same time the mandamus action was filed, the city brought a suit for an injunction against Ware to restrain him from building a business building on this lot. He filed a cross-petition asking that the city and its officials be restrained from interfering with the construction of his proposed building. Ware prevailed in that action, it being decided on the same day the writ of mandamus was allowed to him. This injunction case was not appealed, and it is only chronicled here because it was set up as *res judicata* in defense in a later action by the city to which reference will presently be made.

About the time the mandamus and injunction suits were decided, the plan of development prepared by the city planning commission was finished, and thereupon the city, under authority of chapter 100 of the Laws of 1921, enacted an ordinance dividing the city into zones or development districts and regulating and restricting the location and character of buildings, trades and industries therein. The zoning ordinance, which incorporates two maps showing the division of the city into districts, is too elaborate for reproduction here. In substance the city is divided into five districts or zones—residential districts "A" and "B," a commercial district "C," a light industrial district "D," and a heavy industrial district "E." Throughout the residential districts, "A" and "B," provision is made at convenient intervals for commercial locations to serve the reasonable immediate needs of each particular neighborhood. There are also certain "area" restrictions, "A," "B," "C" and "D," in respect to the erection of new buildings. In these area districts, buildings are required to have a certain amount of space for side yards and rear yards and to be so placed as to be in line with adjacent property with reference to distance from the street.

The most exacting requirements and restrictions provided by the zoning ordinance are those covering residence district "A" and area district "A." Plaintiff's lot is located in residence district "B" and in area district "B," where the requirements and restrictions are more liberal, but business buildings are not permitted therein.

As soon as this zoning ordinance was adopted, the city commenced a suit to enjoin Ware from constructing his proposed building in violation of its terms. A temporary injunction was issued. Ware, as defendant, moved to set it aside for various reasons and set up the judgments in his favor in the mandamus action and in the earlier injunction case. He also urged that the relief sought by the city would be retroactive, that the ordinance violated the fourteenth amendment, and the uniformity clause of section 17 of article 2 of the state constitution, that it deprived him of his property rights without compensation, that the ordinance was passed after his rights had accrued, that it was unreasonable and permitted the city officials to administer it at their discretion, with obvious and convenient opportunities for fraud and favoritism.

These objections to the temporary injunction were overruled; and the defendant appeals. This is case No. 24,542.

Defendants points out that by the result reached in these cases, the judgments in mandamus and injunction first entered in his behalf were rendered nugatory by the last judgment, which was in favor of the city. This anomaly is more superficial than real. When the mandamus and first injunction suits were decided there was no zoning ordinance; hence the lot owner might very properly have prevailed in those actions. But when the zoning ordinance was adopted (and its enactment followed immediately on the heels of the earlier litigation and before the defendant had done anything substantial towards the construction of the proposed building), it governed the then existing rights of the defendant property owner. Counsel for defendant cite cases which declare the general rule that a statute or ordinance should be construed as dealing only with conditions arising after its enactment, and that legislation should not be given a retrospective operation unless such intention is unequivocally expressed. But this zoning ordinance was undoubtedly designed as a police regulation to arrest the further indiscriminate construction of miscellaneous business buildings in the residential districts of the city, as well as to provide for the future harmonious development of the town. It is only to a slight extent, if any, that the ordinance

may be said to have a retrospective operation; it would be more precise to say that it merely crystallized the actual conditions at the time of its adoption. It did not bar buildings already built or prevent the completion of buildings partly constructed, but did provide that buildings not then substantially in course of construction and all those thereafter to be erected would have to conform to its terms. Such municipal legislation is not invalid, and the fact that the defendant had applied for a permit, and that his right thereto as of the date of his application had been adjudicated in his favor, did not prevent the new ordinance, when it was enacted, from governing the situation. (*Shepherd v. Kansas City,* 81 Kan. 369, 375, 105 Pac. 531.) The permit was not issued; it has not yet been issued; and the passage of the ordinance altered the status of defendant's right thereto. (*In re Cherry,* 193 N. Y. Supp. 57; 23 Cyc. 1161.) Even if the permit had been actually granted, it could have been revoked after the passage of the ordinance, if done with reasonable promptness and before the situation had been materially changed to the prejudice of the defendant. (*City of Des Moines v. Manhattan Oil Co.,* 193 Iowa, 1096, syl. ¶ 2.)

The next contention is that the zoning ordinance and the statute which authorizes it have the effect of taking defendant's property or of diminishing its value without compensation. It often happens that a valid exercise of the police power has such effect. The most common examples of this are found in statutes and ordinances relating to the health, safety or morals of the people. With the march of the times, however, the scope of the legitimate exercise of the police power is not so narrowly restricted by judicial interpretation as it used to be. There is an æsthetic and cultural side of municipal development which may be fostered within reasonable limitations. (See *Paola v. Wentz,* 79 Kan. 148, 152, 153, 98 Pac. 775; *Remington v. Walthall,* 82 Kan. 234, 108 Pac. 112.) Such legislation is merely a liberalized application of the general welfare purposes of state and federal constitutions. We note that the supreme court of Texas rejects this view (*Spann v. City of Dallas,* 111 Tex. 350) in considering an ordinance of the city of Dallas which prohibited the construction of business buildings in a residence district, but the Dallas ordinance appears to have been founded on the mere general grant of legislative authority conferred on Texas municipalities. We have held invalid a somewhat similar Kansas municipal ordinance which had no stronger basis for its support. (*Smith v. Hosfield,* 106 Kan. 363, 187

Pac. 685; see, also, *City of Goodland v. Popejoy,* 98 Kan. 183, 157 Pac. 410.) But an express grant of power to cities of 20,000 inhabitants to enact zoning ordinances followed the Smith-Hosfield decision at the next regular session of the legislature. (Laws 1921, ch. 100.) Even the Texas decision takes note of a possible justification for such ordinances made pursuant to an express grant of legislative power.

"Another decision strongly relied on by the defendant in error is *In re Opinion of the Justices,* 234 Mass. 597, 127 N. E. 525. The decision sustains the validity of an ordinance segregating manufacturing and commercial buildings from homes and residences. But the ordinance, it appears, was passed under an express amendment to the constitution of Massachusetts, granting to the legislature the express power to limit buildings, according to their use or construction, to specified districts of cities and towns. We have in Texas no such constitutional provision." (*Spann v. City of Dallas,* supra, p. 361.)

It need hardly be said that a valid statute expressly granting to cities such power is just as potent as a constitutional provision to the same effect. In considering federal constitutional inhibitions upon the power of the states touching municipal regulations on the use of property, the *Opinion of the Justices of Massachusetts* is so instructive that we quote pertinent excerpts therefrom:

"While the Supreme Court of the United States has not decided, so far as we are aware, that the exercise of the police power cannot rest on æsthetic considerations alone as its sole basis, we draw the inference from what has been said on that subject that at present at all events that foundation, standing alone, hardly would be regarded as sufficient, but it may be considered in a subsidiary way. . . . It is only in an incidental way that, in carrying out that cardinal object, regard may be given to considerations bearing upon municipal adornment or embellishment. . . . Enhancement of the artistic attractiveness of the city or town can be considered in exercising the power conferred by the proposed act only when the dominant aim in respect to the establishment of districts based on use and construction of buildings has primary regard to other factors lawfully within the scope of the police power.
.  .  .

"We are of opinion that the proposed statute cannot be pronounced on its face contrary to any of the provisions of the Federal Constitution or its Amendments. The segregation of manufacturing, commercial and mercantile business of various kinds to particular localities, when exercised with reason, may be thought to bear a rational relation to the health and safety of the community. We do not think it can be said that circumstances do not exist in connection with the ordinary operation of such kinds of business which increase the risk of fire, and which render life less secure to those living in homes in close proximity. Health and security from injury of children and the old and feeble and otherwise less robust portion of the public well may be

Ware v. City of Wichita.

thought to be promoted by requiring that dwelling houses be separated from the territory devoted to trade and industry. The suppression and prevention of disorder, the extinguishment of fires and the enforcement of regulations for street traffic, and other ordinances designed rightly to promote the general welfare, may be facilitated by the establishment of zones or districts for business as distinguished from residence. Conversely, the actual health and safety of the community may be aided by excluding from areas devoted to residence the confusion and danger of fire, contagion and disorder which in greater or less degree attach to the location of stores, shops and factories. Regular and efficient transportation of the breadwinners to and from places of labor may be expedited. Construction and repair of streets may be rendered easier and less expensive if heavy traffic is confined to specified streets by the business there carried on. It is easy to imagine ordinances enacted under the assumed authority of the proposed act which would exceed the constitutional limits of the police power and be an indefensible invasion of private rights. But it cannot be presumed in advance that municipalities will go outside their just powers and unwarrantably interfere with property. Cases of that sort must be dealt with if and when they arise." (pp. 604, 605, and 611.)

In *State, ex rel. Twin City B. & I. Co. v. Houghton,* 144 Minn. 1, where mandamus to compel the granting of a permit to erect a cereal mill in a residential district of St. Paul was denied, the court took into consideration the fact that such an incongruous use of property in that locality would depress the value of adjacent property thereabout. The St. Paul ordinance provided compensation for damages arising from restrictions in the use of property, which would indicate that it was founded on the public right of eminent domain rather than on the police power, but the court used this significant language:

"Another reason is that giving the people a means to secure for that portion of a city, wherein they establish their homes, fit and harmonious surroundings promotes contentment, induces further efforts to enhance the appearance and value of the home, fosters civic pride and thus tends to produce a better type of citizen. It is time that courts recognized the æsthetic as a factor in life. Beauty and fitness enhance values in public and private structures. But it is not sufficient that the building is fit and proper, standing alone, it should also fit in with surrounding structures to some degree. People are beginning to realize this more than before, and are calling for city planning, by which the individual homes may be segregated from not only industrial and mercantile districts, but also from the districts devoted to hotels and apartments."

The writer of a timely article, "The Attitude of the Law Toward Beauty," in the American Bar Association Journal for August, 1922, page 470, *et seq.,* urges that æsthetic considerations be recognized as

sufficient in themselves to justify reasonable municipal regulations governing the use of property without resorting to some attenuated theory that such regulations have to do with health, safety or morals.  He says:

"With many protestations and by means of the fantastic argument that bill-boards are a menace to public safety, the courts have nevertheless given aid to the movement for protection against this disfigurement.  Has the time not come, or at least is it not almost here, when the courts will drop the mask of an exclusive concern for safety and health that in the case of bill-boards is not real, and frankly approve reasonable regulation of the use of property in, the interest of beauty?"

It cannot be denied, however, that there is good ground for the view that a reasonable zoning ordinance has some pertinent relation to the health, safety, morals and general welfare of the community. The quotation made above from the Massachusetts court's opinion is a persuasive argument to that effect.  Our own court is committed to the view that if there is fair ground for differences of opinion touching the existence of an evil to be remedied, the police power may be invoked to suppress it, and the legislature is the exclusive arbiter of when, how, and to what extent it may be invoked.  In *The State v. Wilson,* 101 Kan. 789, 168 Pac. 679, it was said:

"The assumption that the police power extends only to the protection of the health, safety and morals of the public, which was at one time quite general, is now out of date.  The modern view is that the state may control the conduct of individuals by any regulation which upon reasonable grounds can be regarded as adapted to promoting the common welfare, convenience, or prosperity.  (6 R. C. L. 203, 204.)  . . .

"The question for our determination is not whether in our judgment the objections urged against the trading-stamp device, on which the statute is based, are sound, but whether they are so plainly unsound that they may be confidently characterized as unreasonable and capricious.  . . .

"Whether the plan may reasonably be expected to cause improvident purchases; whether in practice it does so; and whether it tends to mislead the buyer; are questions for the final determination of the legislature if there is any reasonable ground whatever for a difference of opinion on the subject. . . . We acquiesce in the view of the federal supreme court that there is sufficient room for a reasonable difference of opinion as to whether the 'premium system' is attended with evil consequences to the public, to place the affirmative decision of that question by the legislature beyond the reach of the courts, and, therefore, that a statute which places a special burden upon a business employing that device does not thereby so far infringe upon individual freedom of action and contract as to transcend the powers of government."  (p. 794, *et seq.*)

The other objections to the ordinance have all been carefully considered, but they present nothing to justify further discussion. Whatever possible defects in the ordinance can be suggested, none of them is pertinent to the cases before us. If in the future administration of the ordinance some conjectured but not yet existent oppression may arise, that situation can be judicially dealt with in due course. (*Miller v. State Board of Embalming*, 110 Kan. 135, 141, 142, 202 Pac. 619.) Chapter 99 of the Laws of 1921, which authorizes the creation of city planning commissions in cities of 20,000 population, and chapter 100 of the Laws of 1921, which authorizes such cities to establish districts or zones within their corporate limits and to regulate the use of property and the construction of buildings therein, are not unconstitutional.

The appeal in the mandamus case, No. 24,337, is dismissed at the cost of the city of Wichita. The judgment in favor of the city against Ware, case No. 24,542, is affirmed.