## VALIDITY OF THE CINCINNATI ZONING ORDINANCE.

### Superior Court of Cincinnati.

JOHN SANTANGELO VS. THE CITY OF CINCINNATI, ET AL.

#### Decided, June 18, 1924.

*Zoning—Cincinnati Ordinance Held Constitutional—Provision Protecting Residence Property from Invasion by Business Enterprises Held Reasonable—Building Permits—Character of—Permits may be Revoked for Cause—Subsequent Permit to Proceed Subject to Zoning Law.*

1. A building permit does not constitute a contract or create any vested interest.

2. The building commissioner of the City of Cincinnati has jurisdiction and discretion to revoke a building permit granted by him when the application contains material misrepresentations, or the work authorized thereunder is proceeding in violation of law including the occupational tax law.

3. Where a building permit is granted prior to the effective date of the zoning law and is revoked by building commissioner after said law goes into effect, subsequent permission to proceed is subject to the provisions of such zoning law when substantial construction has not already commenced.

4. The Cincinnati zoning law (Ordinance No. 71-1924, of Cincinnati, Ohio), is a valid and constitutional ordinance.

5. The provisions of the Cincinnati zoning ordinance are independent, and the provision thereof restricting residential property from invasion by business enterprises is a reasonable regulation, well within the police power of the municipality.

*Roettinger & Street,* for plaintiff.
*Saul Zielonka,* City Solicitor, and *Landon Forchheimer,* Assistant City Solicitor, for defendants.

MARX, J.

On April 24, 1924, the plaintiff, John Santangelo applied to the building commissioner of the city of Cincinnati for permission to change the double door of the garage of a building purchased by him, at 2620 Melrose Ave., in Cincinnati to a show window and to change a small window to a door for the purpose of using said building to conduct therein

a store for the sale of delicatessen, vegetables and groceries (petition).

On April 25, 1924, the city building commissioner granted the plaintiff a permit to alter his building in accordance with his application and plans and the building laws and ordinances then in force.

On May 21, 1924, the building commissioner revoked the permit previously granted to the plaintiff and all work on said building was ordered stopped. Between the time of granting said permit April 25, 1924, and the time of its revocation, May 21, 1924, the so-called Zoning Ordinance of the City of Cincinnati, No. 71-1924 became effective. This ordinance passed the city council April 1, 1924, was filed in the Mayor's office April 3, 1924, and became effective thirty days from the date of filing, namely May 4, 1924.

The plaintiff claims that the action of the building commissioner in revoking his building permit is contrary to law and to the Constitutions of the state and United States, and says that unless the building commissioner is restrained from interfering with the alleged right of the plaintiff to proceed under the permit issued April 21, 1924, he will be deprived of the enjoyment and use of his premises as guaranteed to him under the Constitution; wherefore, the plaintiff prays that the building commissioner be enjoined from interferring with the plaintiff in making the proposed alterations in his said building and opening a delicatessen, vegetable and grocery store therein.

The answer of the city of Cincinnati and the building commissioner asserts the right of said city and building commissioner to revoke the permit granted by him upon the following grounds:

First.    That the plaintiff was not the owner of said property at the time he applied for his permit.

Second.    That said permit was obtained by misrepresenting the previous use of said property; and,

Third.    That the contractor named in said application was not authorized by law to do said work and was not in fact

the contractor engaged in the performance of said work.

The reply of the plaintiff admits that he did not receive a deed for the property until May 2, 1924, but claims that he entered into a contract to purchase the property on April 12, 1924.

By reason of the view taken by the court of this case, it is not necessary to discuss the question of whether the plaintiff had a sufficient interest to enable him to apply for a permit.

Concerning the claim that the plaintiff misrepresented the prior use of said property when he applied for his permit, the court deems such representation immaterial in so far as the issuance of this permit was involved on April 25, 1924. The city alleges that the plaintiff represented to the building commissioner that his property had previously been used as a public garage and automobile repair shop, whereas, it had only been used as a private garage. However, on April 25, 1924, there was no ordinance which prohibited the use of the plaintiff's property for store purposes and hence, any misrepresentation as to its prior use or as to its intended use, so long as such use was lawful, did not bear upon the right of the plaintiff to secure a permit.

However, a more serious question presents itself with reference to the alleged misrepresentation of the plaintiff as to the contractor and the right of such contractor to do such work.

The application of the plaintiff (Exhibit 5), is for permission to alter the front of his building "in accordance with the following detailed statement and subject to the regulations of the building code."

The first statement made by the plaintiff reads as follows:

"Name of contractor, Payne Bros., Building Company."

From the evidence it appears that Payne Bros. Building Company were not the contractors and were never engaged upon this work and that no notice was given to the building commissioner that any different contractor was engaged upon the work although another contractor was in fact employed.

A building commissioner in issuing a permit is vested with reasonable discretion. In the course of his experience, he becomes acquainted with the standing and integrity of various contractors and architects and, in the exercise of his discretion, is entitled to take into consideration as a material fact, the contractor and architect which the owner states will be engaged upon the work for which a permit is asked.

It is obvious that an owner cannot name a reliable person for the purpose of securing a permit and then employ an unreliable person. The representation as to the contractor is clearly material and upon discovery of the substitution of a different contractor, the building commissioner is within his discretion in revoking a permit and stopping work until he is satisfied that the contractor doing the work is authorized and is proceeding in accordance with law.

In this case, it further appears that the contractor named in the application although permitted to do work in the city of Cincinnati at the time the permit was issued, was without such authority at the time such permit was revoked by reason of not having paid his occupational tax.

There is no doubt under the evidence that the Payne Bros. Building Company did not pay their occupational tax after April 30, 1924, for the six months' period beginning May 1, 1924, as provided in Section 812-5 in Ordinance No. 312-1920.

Under Section 812-10 of said ordinance, it is made unlawful for any person, firm or corporation to carry on its occupation or business in the city of Cincinnati without having paid the tax provided for in said ordinance. This occupational tax law has been held constitutional. Hence, the Payne Bros. Building Company were without lawful authority to carry on business in the city or to do the work for which permission was granted by the commissioner of buildings. In addition, Section 812-13 of said ordinance provides as follows:

"Whenever a permit or examination is required from any department of the city for the doing of any work, such permit shall not be granted or issued to a party, or an examination made for a party, subject to the provisions of this ordi-

nance, unless and until such party shall have paid the tax herein provided for in accordance with the terms of this ordinance.''

It will be noted that the above section specifically prohibits the granting of a permit by any department of the city for the doing of any work, which includes building unless the occupational tax has been paid.

Section 347 of the Building Code expressly provides that:

"Each and every permit issued by the Commissioner of Buildings shall be subject to the revocation by him whenever it appears that the building or structure provided for therein, in the case of building permits * * * is being so constructed as to violate any of the terms and conditions of this Code, or any ordinance of the city, or any statute of the state relating to the same subject matter."

The same section further provides:

"The revocation of the permit in every instance shall be in writing and shall be served upon the owner or his agent or *contractor in charge of the work* and posted upon the building or structure for which such permit was granted, or in which the work is being done; and from and after such revocation of said permit and the posting of said notice, all work of every kind and character on such building or structure shall be discontinued."

In our opinion, the building commissioner was justified in the exercise of his discretion in revoking the permit involved in this case upon discovery that the Payne Bros. Building Company was not doing the work or could not do the same without violating the occupational tax ordinance.

There is no doubt that the building commissioner in revoking the permit of the plaintiff complied with the provisions of the ordinance by serving him with notice and posting a notice upon the premises. It is complained that he did not give the plaintiff notice and a hearing but it is sufficient answer to say that the proceeding is administrative and in such case, the prevalent view is that notice and a hearing are not

essential. *Child* v. *Bemus*, 17 R. I., 230; *People* v. *Department of Health*, 189 N. Y., 187; *State* v. *Cote*, 122 M., 450.

See article on administrative tribunals in 36 Harvard Law Review, 583, and 28 Harvard Law Review, 198.

Before the plaintiff can continue with the alteration of his building, he must secure permission from the building commissioner. Application for such permission has not been made and, if made, would be subject to the laws "in force," which this court interprets to mean at the time when application for permission to proceed is made.

The plaintiff contends that having now secured a contractor who is competent to do the work in question and who has paid the occupational tax, he should be entitled to proceed without interference from the building commissioner. This is true if the so-called Zoning Ordinance of the City of Cincinnati entitled "An Ordinance to regulate, restrict and limit the use of buildings and other structures" No. 71-1924, is an invalid and unconstitutional enactment.

It is conceded that the property of the plaintiff is within the Zone designated by the ordinance and accompanying map as a "Residence B" district in which all businesses and stores of the character proposed by the plaintiff are prohibited. We are thus brought face to face with the question of the constitutionality of the Cincinnati Zoning Ordinance. It cannot be questioned that the permit of the plaintiff having been revoked prior to the proposed changes having been made and the Zoning Ordinance having become a law in the interim, any new permit would be subject to such law.

A recent decision to this effect is *Ware* v. *The City of Wichita*, in the Supreme Court of Kansas, 214 Pac., 99, decided April 13, 1923. That case is practically on all fours with the present as the following pertinent language will indicate.

"When the mandamus and first injunction suits were decided, there was no Zoning Ordinance, hence, the lot owner might very probably have prevailed in those actions. But when the Zoning Ordinance was adopted, it governed the

then existing rights of the then defendant property owner.
* * * *Even if the permit had been actually granted, it
could have been revoked after the passage of the Ordinance if
done with reasonable promptness, and before the situation had
been materially changed to the prejudice of the defendant.*"

The same proposition was determined in *City of Des Moines*
v. *Manhattan Oil Company*, 193 Iowa, 1096, decided June 19,
1922. In that case permission to establish an oil station was
prevented by the establishment of a restricted residential dis-
trict and the ordinance was held applicable. The language
of the court is so apt that it might have been intended for
the very case at bar. After stating that the granting of a
building permit "did not have the effect to confer upon the
property owner or his lessees a vested right which could not
be cancelled or recalled," the court continues:

"The lessor had not yet acquired title to the property, and
did not acquire it until after the permit had been rescinded."

The proposed filling station had not been constructed, al-
though it is claimed that certain material intended for that
use had been deposited there. When the application for per-
mit was made, there was then pending and undisposed be-
fore the council, as the applicant well knew the petition of
the property owners within this area to make it a restricted
residence district and after council having adopted the reso-
lution to grant the permit under such circumstances, con-
cluded that it had acted inadvertently or inprovidently, or
without proper regard to the rights of their petitioners for
a restricted district, and rescinded the resolution with rea-
sonable promptness, we are of the opinion that it did not
exceed its authority or abuse its discretion."

In the present case, the court is convinced from the evidence
and an inspection of the premises that no material change in
the building of the plaintiff has been made. The doors of the
garage have been removed but can easily be rehung. A trifling
amount of excavation has been done which can easily be re-
filled. No structural changes have been made, nor has the

property of the plaintiff been disturbed in any manner.  For these reasons, there is no hardship in applying the Zoning Law, if constitutional, to the present case.

*What is the present case in so far as the constitutionality of Zoning is concerned?*  The property of the plaintiff is located on Melrose avenue in Walnut Hills.  Melrose avenue begins at Beecher street and runs in a southerly direction to McMillan street.  Approximately 250 to 300 feet of Melrose avenue at its junction with McMillan street and near Peebles Corner is devoted to business and is properly included in one of the business zones provided by the ordinance and map. With this exception and that of a small dry cleaning station at the corner of Melrose and Oak streets, the entire length of Melrose avenue, consisting of four blocks, is a beautiful residential district entirely free from any business establishments with the single exception above noted.  All of Melrose avenue except the extreme southern end and a large area to the west is included by the ordinance and accompanying map within Residence B district, in which stores are prohibited. In this beautiful and private residential district the plaintiff claims a constitutional right to open a delicatessen, vegetable and grocery store contrary to the provisions of the ordinance duly passed by the city council.

*What is the Zoning Ordinance which we are asked by the plaintiff to declare unconstitutional?*

The preamble of the ordinance recites that it is:

"To regulate, restrict and limit, in the interest of public health, safety, convenience, comfort, prosperity and general welfare, the uses and the location of buildings and other structures and of premises to be used for trade, industry, residence, or other specified uses, the height, bulk and location of buildings and other structures hereafter erected or altered, including the percentage of lot occupancy, setback building lines and the area of yards, courts and other open spaces; and for said purposes to divide the city into zones or districts of such number, shape and area as are deemed best suited to carry out the said purposes; and to provide a method of administration and to prescribe penalties for the violation of the within provisions."

In accordance with this declared purpose, the ordinance
provides a comprehensive and city-wide plan shown on ac-
companying maps for the establishment of districts in various
parts of the city for residence, for business and industry. In
all, eight classes of districts are established, known as Resi-
dence A, B, and C; Business A and B, and Industrial A, B
and C. The ordinance contains elaborate provisions as to what
uses are permitted within these areas, providing for the pro-
tection of the residence districts against obnoxious and unde-
sirable business and industry (Secs. 18, 19 and 20) and pro-
viding ample space for legitimate business protected against
heavy manufacturing institutions (Secs 21 and 22); and pro-
viding ample areas within the industrial zones for all kinds
of manufacturing and other developments, including wholly
unrestricted areas within industrial C zones (Sections 23 and
24). The ordinance is not made retroactive and permits all
existing non-conforming uses to continue (Secs. 25 to 28),
and permits all construction actually commenced within six
months from the date of any permit issued prior to the Zon-
ing law to continue (Sec. 90). In addition, the ordinance
provides reasonable limitations upon the height of buildings
dependent upon the character of zones (Secs. 29-40) and care-
fully worked out provisions for the set-back of building lines
from the street (Secs. 41-50). Rear yards, side yards and
courts are regulated in accordance with accepted practice in
Sections 51-75, inclusive. There is ample provision for amend-
ment (Sec. 89). The enforcement of the ordinance is cov-
ered in Sections 76 and 77 and by Sections 91 and 92, which
make any use of property contrary to the provisions of the
ordinance, unlawful and prohibit the commissioner of build-
ings from granting any permit for

"alteration, construction, or addition * * * until he is
satisfied that the plans and specifications and intended use
conform to the provisions of this ordinance."

One of the most important and valuable chapters of the
ordinance is that providing for the establishment of a Board

of Appeals, consisting of five members, including a member of the City Planning Commission, a realtor, an architect, and a structural engineer (Sec. 78). Section 80, authorizes the Board of Appeals to adopt such rules and regulations as it may deem necessary to carry into effect the provisions of the ordinance. Appellate jurisdiction is conferred upon the Board of Appeals to review decisions of the building commissioner (Sec. 81). The board may correct errors in the zoning map (Sec. 82) and may permit such prohibited uses as are incidental to the permitted use, subject to such conditions as will safeguard the public health, safety, convenience, and welfare (Sec. 83). The board may also grant conditional and temporary permits for such prohibited uses as promote the development of new sections (Sec. 84). In a general sense, the Board of Appeals has power to relieve any property owner from any unforeseen hardship imposed by the ordinance and Section 85 contains this significant and wise provision:

"Where the strict application of any provision of this ordinance would result in undue hardship upon the owner of specific property, or where there is reasonable doubt as to any provision of this ordinance or the maps as applied to such property, the board of appeals shall have the power upon application by such owner, and after public hearing, notice of which has been given by publication one time in a newspaper of general circulation seven days in advance thereof, to modify such strict application, or to interpret the meaning of this ordinance so as to relieve such hardship; provided that such modification and interpretation shall remain in harmony with the general purpose and intent of this ordinance, so that the public health, safety, convenience, comfort, prosperity and general welfare will be conserved and substantial justice done; and accordingly within the above limitations the board of appeals may permit among others the modifications and interpretations set out in Sections 452-86, 452-87 and 452-88."

Such in general outline are the salient features of the Zoning ordinance which we are asked to declare unconstitutional upon the familiar grounds that it is a taking of private

property without compensation contrary to Section 19, Article 1, of the Ohio Constitution and deprives the plaintiff of his property without due process of law and denies to him the equal protection of the laws contrary to Section 1, Article 14 of the Constitution of the United States.

At the outset, it should be pointed out that no court, least of all a court of first instance should declare invalid and unconstitutional, a law duly enacted by the legislative body of the city or state and inferentially approved by the people thereof since no referendum was filed, unless such law is so clearly and manifestly contrary to the Constitution that reasonable minds would have no doubt thereof. Every presumption must be indulged in favor of the validity and constitutionality of the law and the burden rests upon those who seek to set the same aside.

The law purports to be enacted in pursuance of the police power inherent in the people of the municipality. The power to enact zoning laws is specifically granted in Sections 4366-1 to 4366-12 of the General Code, inclusive.

Section 4366-7 of the General Code of Ohio, provides:

"The city planning commission of any municipality shall have the power to frame and adopt a plan or plans for dividing the municipality or any portion thereof into zones or districts, representing the recommendations of the commission, in the interest of the public health, safety, convenience, comfort, prosperity or general welfare, for the limitations and regulation of the height, the bulk and location (including percentage of lot occupancy, set back building lines, and area and dimensions of yards, courts and other open spaces), and the uses of buildings and other structures and of premises in such zones or districts."

Section 4366-8 provides that whenever the city planning commission of any municipality is created under state statute or municipal charter, certifies to the council any such plan for the districting or zoning of the municipality according to the uses of the buildings and other structures and of premises, then said council in the interest of the promotion of public health, safety and general welfare,

"may regulate and restrict the location of buildings and other structures and of premises to be used for trade, industry, residences or other specified uses, and for said purposes divide the municipality into districts of such number, shape and area as may be deemed best suited to carry out the purposes of this section. For each of such districts regulations may be imposed designating the kinds or classes of trades, industries, residences or other purposes for which buildings or other structures or premises may be permitted to be erected, altered or used subject to special regulations."

Section 4366-9 specifically grants power to regulate the height of buildings. Section 4366-10 grants council power to regulate the bulk, location, percentage of lot occupancy and set back of buildings. Section 4366-11 grants power to classify buildings on the basis of the nature of character of trade, industry or other activity conducted therein and upon the basis of the number of persons, families or other group units residing therein, or upon any other basis relevent to the promotion of the safety, health and welfare of the community.

Section 4366-12 provides that the foregoing powers are additional to the powers of a municipality under Article 18 of the Ohio Constitution and to the charter powers of a municipality.

The charter of the city of Cincinnati, adopted November 6, 1917, provides in Chapter 7, for the establishment of a city planning commission and Section 2 thereof grants power to the commission to make a plan and map of the whole or any portion of the city, and states specifically:

"Such maps and plans may also include the division of the city into zones or districts in accordance with the commission's recommendations for the limitation and regulation of the height, bulk (including percentage of lot occupancy and set back of building lines), *and use of buildings and other structures in such zones or districts.*"

Pursuant to such specific power, the city planning commission of the city of Cincinnati adopted and certified to the

city council of the city of Cincinnati, the zoning ordinance plan and map under consideration, and the city council adopted the same. At the time said ordinance was adopted, the city council had before it, the history preceeding such legislation, the reasons underlying the same and showing in intimate detail the relationship of the provisions of the ordinance to the promotion of the public health, public safety, public convenience, public prosperity and public welfare; including "A statement and evidence submitted on pending zoning ordinance to the city council of Cincinnati, January 24, 1924, by the United City Planning Committee," composed of the civic, commercial and industrial organizations of the city, and representatives of the American Association of Engineers; American Institute of Architects; Central Labor Council; Chamber of Commerce, Real Estate Board; Council of Social Agencies; Public Health Federation, etc.

The city council also had before it a document addressed to the city planning commission of Cincinnati, dated November 20, 1923, by the Technical Advisory Corporation.

It is entirely proper in determining the constitutionality of legislation to consider the history thereof and opinions and articles by physicians, engineers, architects, housing experts, realtors, etc.

The Supreme Court of the United States in *Muller* v. *The State of Oregon*, 208 U. S., 412, in determining the constitutionality of the Oregon Ten Hour Law for Women, considered the reports of committees, bureaus of statistics, commissioners of hygiene, inspectors of factories and said:

"In patent cases counsel are apt to open the argument with a discussion of the state of the art. It may not be amiss, in the present case, before examining the constitutional question, to notice the course of legislation as well as expressions of opinion from other than judicial sources.    *    *    *    The legislation and opinions referred to in the margin may not be, technically speaking, authorities, and in them is little or no discussion of the constitutional question presented to us for determination, yet they are significant of a widespread belief that woman's physical structure, and the functions she

performs in consequence thereof, justify special legislation restricting or qualifying the conditions under which she should be permitted to toil.''

The court concludes:

''At the same time, when a question of fact is debated and debatable, and the extent to which a special constitutional limitation goes is affected by the truth in respect to that fact, a widespread and long continued belief concerning it is worthy of consideration. We take judicial cognizance of all matters of general knowledge.''   (Pages 419-420.)

From the history of the legislation under consideration it appears that the Cincinnati Zoning Ordinance is a carefully thought out, scientific and comprehensive zoning plan, covering the entire city, intended to promote the public health, safety, convenience, prosperity and welfare.  It was prepared as a result of sixteen months of careful study by an advisory commission of experts who had available a large sum for doing all of the technical work required.  The plan was based upon a survey and study of the entire city after consultation with the citizens and groups concerned; was approved by the city planning commission, including the mayor, the director of public service and the park commissioners.  It was then submitted to the city council and enacted into law.  The ordinance upon its face appears to be clearly within the constitutional and charter power of the city to enact such legislation.  As a whole, it appears to be a reasonable exercise of such power.  The burden rests upon any person claiming it unreasonable, to prove such unreasonableness by evidence. Nor, would the fact that one provision of the ordinance was unreasonable, invalidate the other provisions thereof.   In the present case, there is no evidence tending to prove that the particular provision prohibiting a delicatessen, vegetable and grocery store on the Melrose avenue property, a residential street, is unreasonable.  On the contrary, the evidence in the case and the inspection made by the court clearly indicates that this restriction is a reasonable limitation of the

use of the property in the particular district involved, and bears a reasonable and genuine relationship to the happiness, health, and welfare of the immediate neighborhood.

In the statements submitted to the city council (by Bleecker Marquette, Secretary of the Better Housing League, at page 37), the reasons for excluding businesses from residence districts are quoted and are in part as follows:

"Increased noise is an incident of practically every business."

"There is also an increased number of vehicles on business streets, as compared with residential streets."

"The loading and unloading of business vehicles always causes more or less disturbance to the peace of a residential neighborhood. Many stores have their goods consigned to them in crates, boxes, kegs, or barrels which may be dumped from the delivery trucks onto the sidewalk without any fear of injuring the goods."

"The sawing of wood, the hammering, driving and removal of nails incident to the opening and closing of these boxes causes, if anything, more noise than their loading and unloading."

"The day sleep of the night worker is of vast importance, but the night sleep of the day worker is of far vaster importance."

"The same neighborhood businesses which disturb the rest of children and night workers during the day, also disturb the rest of the day worker at night."

"There are certain businesses which always close at a late hour. Drug stores, news stands, candy kitchens, cigar stores, *delicatessen shops,* etc., invariably remain open until at least ten o'clock."

"The intrusion of business is offensive to residential districts because it gives rise to increased dust."

"The exclusion of business protects residence sections against offensive odors."

"Even a comparatively innocuous store exercises a potent influence over the character of a residential block is a matter of every-day experience. The adjoining residents move out. "To let" signs go up and in short time the whole street finds itself in transition from one kind of occupancy to another."

A consideration of such evidence leads the court to the

conclusion that the setting aside of residential areas, free from the blighting influence of business is a necessary and desirable exercise of the police power. The inhabitants of a great city are entitled to areas where they can escape from the noises, dust, odor, congestion and turmoil of business districts. The small and large property owner is entitled to be protected from the intrusion of undesirable businesses and the resulting depreciation in value of his property.

In the case of *Bauer* v. *Huth*, No. 58549, Superior Court, we had occasion to consider the power of equity to prevent a funeral home being established in the beautiful residential district of Clifton. There was no ordinance prohibiting the invasion of such district by funeral homes and this court in regretting its want of authority to enjoin such use of the defendant's property, said:

"If the law as it now stands seems to permit the invasion of unrestricted residential districts by legitimate business enterprises, there is a remedy by the enactment of a comprehensive city plan and zoning system which will protect exclusive and beautiful residential districts on the one hand and provide for the proper location and growth of legitimate business on the other hand."

The very progress of zoning is an indication that zoning is considered necessary to promote the general welfare of people residing in urban communities. On January 1, 1924, according to the Division of Building and Housing of the United States Department of Commerce, zoning ordinances were in force in 221 municipalities in the United States and, during the year 1923, zoning ordinances were adopted by 81 municipalities having a population of eight million, divided as follows: Thirty-three having a population of less than ten thousand; twenty-seven with more than ten thousand and less than fifty thousand and twenty-one having a population of over fifty thousand. It is estimated that twenty-two million Americans, or forty percent of our urban population now live in zoned territory. (Amer. Bar Asso. Journal, May, 1924, page 372; see also article on Zoning Laws and Ordi-

nances, Amer. Bar Asso. Journal, March, 1924, page 185, and Further Comments on Zoning, Amer. Bar Asso. Journal, April, 1924, page 245.)

Notwithstanding the growth of zoning, its constitutionality is still vigorously attacked. For example, in *Ambler Realty Co.* v. *Village of Euclid*, Ohio Law Rep., March 17, 1924, page 607, Judge Westenhaver vigorously assails the zoning law of the village of East Euclid on the ground that when the owner is deprived of the use of his property, he is deprived of its value and is entitled to compensation therefor. The same argument is made in the case at bar. However, there is nothing new or startling in depriving an owner of the use of property or dictating to him the character and kind of improvement he may build thereon.

A decade ago, the same argument was made when the laws requiring proper tenement houses, were before the courts but without avail. In *Tenement House Department of the City of New York* v. *Moeschen*, 179 N. Y., 325, the court said in upholding the constitutionality of laws requiring changes in existing buildings:

"Any one in a crowded city who desires to erect a building is subject at every turn almost to the executions of the law in regard to provisions of health, for safety from fire and for other purposes. He is not permitted to build of certain materials within certain districts. * * * Theaters and hotels are to be built in accordance with plans to be inspected by the inspectors of buildings. Other public buildings also and private dwellings within said districts are subject to the same supervision."

A long line of cases sustained such laws even though the same were made retroactive. *Commissioners of Mass.* v. *Roberts*, 155 Mass., 281; *Health Dept. of City of New York* v. *Trinity Church*, 145 N. Y., 32; *Adams* v. *Cumberland Ins. Co.*, 117 Tenn., 470.

Nor, is it considered unconstitutional to limit the height of buildings and to provide different heights for different districts. *Welch* v. *Swasey*, 214 U. S., 91; *Frederick Ayer &*

*Others* v. *Commissioners on Height of Buildings in Boston,* 242 Mass., 30; *People* v. *T'Deonch,* 103 N. Y., 359.

The power of the municipality to limit the height of buildings is set at rest in Ohio by *State, ex rel., The Euclid Doan Bldg. Co.* v. *Cunningham, Com. & Inspector of Bldgs.,* 97 O. S., 130. In answer to the argument that this was an unreasonable limitation upon the use of private property and would deprive the owner of a large sum of money, Judge Matthias said:

"Nothing seems to be more firmly established than that whatever measures are reasonably necessary to secure and maintain the peace, safety, morals and best interest of the public may be adopted and enforced under the police power, and that private property is at all times "subservient to the public welfare."

The very sections of the zoning ordinance under consideration preventing the invasion of residence districts by stores, has been frequently upheld. *City of Des Moines* v. *Manhattan Oil Co.,* 184 N. W., 823; *Banner Grain Co.* v. *Houghton,* 142 Minn., 28; *Salt Lake City* v. *Western Foundry & Stove Repair Company,* 55 Utah, 447; *Knack* v. *Velick Scrap Iron & Mach. Co.,* 219 Mich., 573; *Hadacheck* v. *Sebastian,* 239 U. S., 394.

In the last mentioned case, the Supreme Court upheld a municipal ordinance prohibiting a brick yard in a residential district.

In *Reiman* v. *Little Rock,* 237 U. S., 171, the court upheld a restriction against a livery stable in a residential district.

Additional cases are unnecessary in Ohio because of the decision of our Supreme Court in *Ohio Hair Products Co.* v. *Rendigs, Bldg. Commissioner,* 98 O. S., 251, in which the first syllabus reads:

"Ordinance No. 457-1917, enacted by the council of the city of Cincinnati, October 2, 1917, forbidding the erection or use of buildings in the residential districts of the city of Cincinnati for the storage, cleaning or renovation of uncured animal hair and the by-products thereof, is not unreasonable nor arbitrary and is a valid exercise of the police power."

In this case, a permit had actually been granted, construction had been started and great expense incurred when the same was revoked by the building commissioner. The plaintiff claimed the ordinance could not be retroactive and that the permit gave him certain rights which were unaffected by the ordinance. However, Judge Newman said:

"It is not necessary to devote much time to this proposition, for it seems to be well settled that a permit such as was issued in this case has none of the elements of a contract and may be changed or entirely revoked even though based, on a valuable consideration, if it becomes necessary to do so in the exercise of a legislative power on subjects affecting the public health or public morals."

The Rendigs case is decisive of this point in the case at bar. Indeed, the building code as it stood prior to the zoning law is crowded with restrictions upon the use of property which have never been questioned. Certainly the fact that all of these restrictions upon the height, bulk, lot occupancy, set back and use are gathered into one comprehensive and scientifically designed plan, does not make unreasonable what was reasonable when it stood alone. The contrary is true. The division of the city into various areas and the protection of those areas against non-conforming uses and the uniform regulations adopted with reference to all property within a given area, all are evidence of a more reasonable rather than a less reasonable regulation of property.

An examination of the daily growing body of authority upon the specific question as to the constitutionality of comprehensive zoning ordinances convinces the court that the overwhelming majority of the decided cases by courts of last resort is in favor of the constitutionality of such zoning ordinances. In view of the excellent article on the Constitutionality of Zoning by Mr. Alfred Bettman, a distinguished member of the Cincinnati Bar in the Harvard Law Review of May, 1924, page 834, in which all of the cases are collected, it would be useless for this court to do more than cite the principal cases upon the subject.

The Ohio cases upholding zoning are: *State, ex rel. Morris. v. Osborne,* 22 O. N. P. (N. S.), 549; *State of Ohio, ex rel., v. Durant, Bldg. Inspector,* Cuyahoga County Court of Appeals, O. L. R., Jan. 14, 1924, page 395.

The latest case is *Kahn Bros.* v. *City of Youngstown,* 25 N. P. (N. S.), 31.

The leading cases outside of Ohio, include: *Lincoln Trust Co.* v. *Williams Bldg. Corporation,* 229 N. Y., 313; *State, on Relation of Carter,* v. *Harper Bldg. Co.,* Supreme Court of Wisconsin, 196 N. W., 451, decided December 11, 1923; *Cliffside Park Realty Co.* v. *Borough of Cliffside,* 96 N. J. L., 278; *Ware* v. *City of Wichita,* 113 Kan., 153; Opinion of the Justices, 234 Mass., 597.

Additional cases are collected in an annotation on Zoning, in 19 Amer. Law Rep., 1395.

See also *Kusack* v. *The City of Chicago,* 242 U. S., 526.

The court has not overlooked the cases denying the constitutionality of such legislation, including *Westminster Presbyterian Church* v. *Edgecomb,* 108 Neb., 859; *Penrose Investment Co.* v. *McKelvey, etc.,* 256 S. W., 474, 489-495; *Ambler Realty Co.* v. *Village of Euclid,* Ohio Law Rep., March 17, 1924, at page 607; *Lucas, re City of Canton,* v. *Ohio, ex rel.,* Ohio Law Rep., December 21, 1923.

Without attempting a complete catalogue of the daily growing list of cases or a detailed analysis of such cases, the court is satisfied that the city of Cincinnati has a right to determine the orderly development of the city and to provide reasonably restricted areas for its industrial, business and residential development.

Such legislation is clearly constitutional and will promote the health, happiness, growth and prosperity of the entire city.

For these reasons, the application for an injunction will be denied and the petition dismissed.