No. 47,799

Floyd E. Houston and Lois L. Houston, husband and wife; Edmond C. Fiedler and Beverly Ann Fiedler, husband and wife; and Samuel T. Luinstra and Helen Luinstra, husband and wife, *Appellants*, v. Board of City Commissioners of the City of Wichita, Kansas, and The City of Wichita, Kansas, *Appellees*.

(543 P. 2d 1010)

324

Opinion filed December 13, 1975.

Lester C. Arvin, of Arvin, Arvin, Busey and Thomas, Chartered, of Wichita, argued the cause, and Rodney H. Busey and Paul Thomas, of the same firm, were on the brief for the appellants.

H. R. Kuhn, of Arn, Mullins, Unruh and Kuhn, of Wichita, argued the cause, and John Dekker, city attorney, was with him on the brief for the appellees.

The opinion of the court was delivered by

FOTH, C.: This is an action brought under K. S. A. 12-712 to test the reasonableness of a 1973 Wichita zoning ordinance which changed the zoning of plaintiffs' property from "LC" light commercial to "B" multiple family. The district court upheld the ordinance and plaintiff property owners have appealed.

The zoning ordinance affected all four corners of the intersection of Eleventh and Waco Streets in a residential district several blocks north of downtown Wichita. The four corners were zoned light commercial in 1946, but no light commercial use was ever developed.

The northeast corner is occupied by a church and the houses on the northwest corner have been converted for use by a chiropractor, florist, beauty shop and other offices. The owners of those two corners have made no complaint about the rezoning and are not parties to this suit.

The southwest corner is owned in part by the plaintiffs Floyd and Lois Houston and in part by plaintiffs Samuel and Helen Luinstra. It contains residences. That portion of the southeast corner owned by the plaintiffs Edmond and Beverly Fiedler contains a house and garage which have been adapted for use as a "halfway house." The Houstons bought their parcels in 1963 and 1968, the Luinstras bought theirs in 1973, and the Fiedlers theirs in 1971.

Mr. Luinstra testified that he bought his parcel with the idea that he would "make some kind of office development sometime in the future." Mrs. Fiedler testified that since purchasing their parcel the Fiedlers had spent $5600 to make it suitable for its present lease as a halfway house. Asked what they had in mind using the property for when they bought it she said "Nothing really in mind. Something that we could make a lease with." Under the new zoning offices for doctors and dentists are permitted, as is a halfway house. The Houstons offered no testimony as to the in-

tended use of their two parcels, although it was apparent they had taken no steps to develop either one during the respective five and ten year periods they had owned them.

The zoning change had its genesis in an otherwise unrelated application to rezone (from "B" multiple family to "C" commercial) four lots between Eighth and Ninth Streets on Waco, some two and a half blocks south of the property involved here. (That application is referred to as the "Huff" case, after one of the owners.) On April 17, 1973, the Huff application came before the city commission with a recommendation for approval from the Metropolitan Area Planning Commission. The city commission, however, sent the application back to the planning commission with a request that the planning body develop a comprehensive zoning policy for the entire six block (¾ mile) stretch of Waco from Murdock Avenue on the south to Thirteenth Street on the north.

At its May 10, 1973, meeting the planning commission received a report from its chief planner describing in some detail the existing zoning and uses on Waco and in the surrounding area. The report observed that "Based on the general residential character of the area, and even though Waco is a major street, it appears that a zoning classification should be established which offers the best protection to the adjacent areas." After discussion the planning commission voted 5 to 2 to again recommend the rezoning of the Huff land between Eighth and Ninth and to recommend the following overall policy for Waco Avenue:

"1. The east side of Waco, between Murdock and Tenth Street, be looked on with favor for either 'LC' Light Commercial, or 'C' Commercial.

"2. The west side of Waco, between the existing 'LC' north of Murdock to Tenth Street, be looked on with favor for either 'B' Multiple Family or 'BB' Office.

"3. On both sides of Waco, between Tenth Street and the existing 'LC' Light Commercial on 13th Street, be encouraged to develop as 'B' Multiple Family; however, that the 'BB' Office District would not be discouraged; *and that the staff be instructed to advertise for a zone change from 'LC' to 'B' for all four corners at 11th and Waco;* and from 'E' to either 'B' or 'BB' for the northwest corner of 10th and Fairview." (Emphasis added.)

The last paragraph, it will be seen, had a potential impact on plaintiff's property.

Both recommendations came before the city commission on May 29, 1973. Mrs. Fiedler appeared in opposition to the proposed policy. The city commission, by a vote of 4 to 1, approved both

the Huff rezoning and the entire recommended policy for Waco Avenue.

In accordance with the instruction in paragraph 3, the next day the planning commission staff prepared and filed in the name of the planning commission an application to rezone the four corners of Eleventh and Waco from "LC" to "B." The reason given for the proposed change was: "To make zoning conform with adopted zoning policy."

Statutory notice was given and on June 28, 1973, the planning commission held its first hearing on the proposed change. The plaintiffs were all heard either personally or by counsel in opposition. Representatives of an association of neighborhood residents were heard in favor. At the conclusion of the hearing the commission voted 4 to 3 against the change.

On July 17, 1973, the planning commission's recommendation to deny the change came before the city commission. That body voted 4 to 1 to return the application to the planning commission "for reconsideration due to the policy established by the MAPC for that area."

The planning commission took the matter up again at its August 9th meeting. The entire history of the application and its impact on the present uses of the property was reviewed. Plaintiffs and plaintiffs' counsel again appeared and aired their views, as did representatives of the association of area residents. Once again the planning commission voted to send the matter to the city commission with a recommendation against the change.

On August 28, 1973, the second report and recommendation of the planning commission came before the city commission. By a 2 to 1 vote an ordinance rezoning the property was given a first reading and put over for further consideration.

The city commission's final action came at its meeting of September 4, 1973. The plaintiffs and their counsel appeared at the meeting and spoke against the change; a residents' association spokesman favored it. After discussion and debate the ordinance was passed 3 to 2.

This suit was then commenced, resulting in the judgment appealed from upholding the ordinance. Mr. Luinstra and Mrs. Fiedler, in addition to their testimony summarized above as to their lack of any specific plans for developing their property, both testified that they bought in reliance on the "LC" zoning. The change to "B"

would in their opinion reduce the value of their property. A real estate appraiser concurred in their opinion.

The commission's director of planning—stipulated to be as good a planner as any in the state—testified that when the intersection was zoned light commercial in 1946 it was customary to place such zoning at ¼ or ½ mile intervals, but that zoning theories and policies had changed since then. In his opinion where old commercial zoning hadn't been utilized for twenty to thirty years, as here, it was appropriate to transfer that much commercial zoning to some other area of the community where it would be utilized. The community, he said, had an "over abundance" of light commercial zoning. The new "B" zoning was, in his opinion "perfectly compatible" with the development in the four blocks surrounding the intersection.

In addition, at trial there was a stipulation as to the "completeness [and] accuracy of the excerpts and the transmittal documents that went from the Metropolitan Area Planning Commission over to the Board of City Commissioners."

The trial court, in upholding the ordinance, came to the following conclusions:

"The plaintiffs challenge the zoning ordinance in question on three broad grounds. First of all, that the ordinance is an arbitrary, unreasonable, and capricious act of the Board of City Commissioners because of the procedure by which the application for zoning change was initiated, treated by the Metropolitan Area Planning Commission, and acted upon by the Board of City Commissioners, all as shown by the stipulations of fact.

"The Court has carefully considered this argument and finds it to be without merit. The Kansas statutes applicable at the time clearly permit both the Metropolitan Area Planning Commission and the Board of City Commissioners to apply for zoning changes or cause them to be applied for by their staff which is what happened in this case.

"Full and complete hearings were held before the MAPC, as shown by the stipulations. Procedural requirements were followed and the suggestion that the Board of City Commissioners acted arbitrarily and capriciously in changing the zoning so as to conform with the previous policy recommendations of the MAPC when that commission had itself recommended against the zoning change is without merit.

"The Board of City Commissioners are the legislative body and are not bound by the recommendations of the MAPC. They are simply bound to receive them and cause them to be made before action.

"The second argument is made that the ordinance is invalid because it recites that 'having received a recommendation from the Planning Commission,' implies that the Planning Commission recommended favorably on the zoning change, is also without merit. The statute requires that the Board of City Commissioners have the recommendations of its Planning Commission in this

case, MAPC, before it can act. It remains free to accept or reject the recommendations and act in accordance with its own findings; and this is what happened in this case.

"The third contention made by the plaintiffs is that the action is arbitrary, capricious and unreasonable because it unconstitutionally deprives the plaintiffs of property. At first blush and stated somewhat argumentatively, the contention raised by the plaintiffs appears to have merit. Upon a closer examination and thorough research of the latest cases, the Court is of the opinion and concludes, as a matter of law, that property owners do not have a constitutionally vested right in zoning regulations applying to their property; and all property owners hold their property subject to the right of the governing body to change the zoning so long as they do not do so arbitrarily and capriciously.

"The record in this case does not disclose that the defendants acted arbitrarily and capriciously, but that they did so only after long hearings and for a valid zoning purpose, that is, to preserve the character of the neighborhood in question.

"The plaintiffs have no more vested right in the continuation of a particular zoning than they do in the routing of highways or the locations of schools or parks which may be changed and which change may incidentally affect the market value of that property.

"Two of the latest cases which the Court considered in reaching this conclusion are *City of Hollywood Beach v. Hollywood Beach Hotel Co.*, Fla. App. 283 SO 2d 867 (1973) and *Kmiec v. Town of Spider Lake*, 211 NW 2d 471 (Wis. 1973). In the latter case it is recognized by the Wisconsin Supreme Court that a reduction in value due to a change in zoning is not by itself sufficient to defeat the zoning ordinance. The former case is authority for the principle that no vested rights arise in zoning regulations until after building permits are obtained in reliance upon the zoning and the property owner substantially changes his position in reliance thereon in good faith. No evidence of that kind is present in this case."

On appeal plaintiffs make their arguments a little differently. They first contend that "preserving the character of the neighborhood" is not a legitimate purpose of a zoning ordinance, because the result is "aesthetic" and not related to the public welfare. The argument is difficult to follow. The authorizing statute, K. S. A. 1974 Supp. 12-707, provides in part, "The governing body of any city is hereby authorized by ordinance to divide such city into zones or districts, and regulate and restrict the location and use of buildings and the uses of the land within each district or zone. *Such zones or districts may be created for the purpose of restricting the use of buildings and land located within the same for dwellings,* business, industry, conservation, floodplain or for other purposes deemed necessary." (Emphasis added.) The whole purpose of zoning is to restrict the permissible uses of land in a zone or "neighborhood," thereby preserving its "character."

It does plaintiffs no good to characterize the purpose here as "aesthetic." As long ago as 1923 we recognized in a zoning case that "[t]here is an aesthetic and cultural side of municipal development which may be fostered within reasonable limitations. [Citations omitted.] Such legislation is merely a liberalized application of the general welfare purposes of state and federal constitutions." (*Ware v. City of Wichita*, 113 Kan. 153, 157, 214 Pac. 99.) Along the same lines, in upholding an urban renewal project the United States Supreme Court commented on the "public welfare" aspect of the police power:

". . . The concept of the public welfare is broad and inclusive. See *Day-Brite Lighting, Inc. v. Missouri*, 342 U. S. 421, 424 [96 L. Ed. 469, 472, 72 S. Ct. 405]. The values it represents are spiritual as well as physical, aesthetic as well as monetary. It is within the power of the legislature to determine that the community should be beautiful as well as healthy, spacious as well as clean, well-balanced as well as carefully patrolled." (*Berman v. Parker*, 348 U. S. 26, 33, 99 L. Ed. 27, 75 S. Ct. 98.)

And see *Village of Belle Terre v. Boraas*, 416 U. S. 1, 39 L. Ed. 2d 797, 94 S. Ct. 1536, where the Court upheld an ordinance zoning an entire village for single family dwellings. In so doing the Court observed:

". . . The police power is not confined to elimination of filth, stench, and unhealthy places. It is ample to lay out zones where family values, youth values, and the blessings of quiet seclusion and clean air make the area a sanctuary for people." (*Id.*, p. 9.)

The zoning here, of course, is not "aesthetic" in the sense that it purports to control the appearance of plaintiffs' property. The objective sought is the exclusion of commercial uses from a residential area. Any "aesthetic" effect is purely incidental and entirely permissible. See Anno., *Zoning-Aesthetic Considerations*, 21 A. L. R. 3d 1222. We hold that preserving the residential character of the neighborhood was a legitimate purpose of the zoning ordinance.

Plaintiffs' second point is that the city acted "arbitrarily and unreasonably in passing the zoning ordinance in question." Under this point they interweave what we perceive as four different arguments.

First, they say it was arbitrary to zone their property "B" while at the same time rezoning the Huff property 2½ blocks away "C." The argument is based on *Barclay v. Mitchum*, 186 Kan. 463, 350 P. 2d 1109, where a finding of arbitrariness was upheld because of unassailed findings by the trial court that similarly situated property was treated dissimilarly. That, of course, is not the situ-

ation here. In addition, subsequent limitations this court has placed on that case as authority in zoning cases were recently reviewed in *Hukle v. City of Kansas City,* 212 Kan. 627, 512 P. 2d 457. Without repeating that review here, we do repeat our conclusion that "[t]he precedential value of *Barclay* in zoning law has been largely eroded by subsequent decisions." (P. 637.) In *Hukle* the proper role of the courts, found in one form or another in all our zoning cases, was restated in paragraph 10 of the syllabus:

"Where the rezoning decision before the zoning authority is fairly debatable a reviewing court may not substitute its judgment for that of the zoning authority in order to change the decision on the debate."

The issue here was at best debatable, with the result that we cannot say the decision to rezone was so unreasonable as to be arbitrary.

Their second argument on arbitrariness is that the city commission was *per se* arbitrary in rejecting the recommendation of the planning commission. The argument misconceives the respective roles of the two bodies.

". . . [T]he function of the planning commission is advisory only, its authority being limited to a study of the facts and submission of its recommendations to the governing body wherein authority to take final action lies." (*Burke & McCaffrey, Inc. v. City of Merriam,* 198 Kan. 325, 327, 424 P. 2d 483.)

See also, *Coughlin v. City of Topeka,* 206 Kan. 552, 480 P. 2d 91; *Bodine v. City of Overland Park,* 198 Kan. 371, 424 P. 2d 513; *Arkenberg v. City of Topeka,* 197 Kan. 731, 421 P. 2d 213; *Waterstradt v. Board of Commissioners,* 203 Kan. 317, 454 P. 2d 445; and *Creten v. Board of County Commissioners,* 204 Kan. 782, 466 P. 2d 263. As the trial court noted, the recommendation of the planning commission was directly contrary to the policy it had previously recommended and which had been approved by the governing body. The city commission was certainly entitled to conform to the previously adopted policy.

Complaint is also made of the city's procedure in adopting zoning ordinances. The city commission's policy is that public hearings on zoning matters are to be conducted by the planning commission as provided by statute. An additional public hearing before the city commission is not conducted unless a party alleges either that the planning commission hearing was unfair or that there are new facts or new evidence.

In this case plaintiffs *were* afforded a hearing before the city commission, at which counsel, Mrs. Fiedler, Mr. Houston and Mr.

Luinstra were all heard. The record shows, in fact, that both counsel and Mr. Houston were allowed additional time to present their arguments to the city commission. Under these circumstances their complaint really is that they were heard as a matter of grace and not of right. Such a complaint is purely academic, since they were in no way prejudiced by the city's procedure.

But even if the city commission had not heard them they would have no valid grounds for complaint. There is no allegation that the city did not strictly comply with the procedure set forth in K. S. A. 1974 Supp. 12-708. The required notice was given, and two full and complete hearings were held by the planning commission, at which plaintiffs appeared in person or by counsel. The substance of the arguments pro and con was recorded, and a complete record of the proceedings was certified to the governing body on each occasion. There is nothing in the statute requiring the city commission to rehear the matters which were presented to the planning commission, nor are we cited any authority which would impose such a requirement as a matter of constitutional law.

A contention similar to plantiffs' was made in *Tulsa Rock Co. v. Board of Cty. Com'rs of Rogers Cty.*, Okl. App., 531 P. 2d 351 (1974). There a full hearing was held by the planning commission but the city commissioners' meeting at which the zoning ordinance was adopted was held without notice and no hearing was held by that body. As here, the city commission reversed the recommendation of the planning commission. The court gave short shrift to the landowner's procedural complaint, observing, "The law does not require that the Board [of city commissioners] duplicate the Planning Commission hearing; it provides for a hearing by the Planning Commission, and such a hearing was in fact held and resulted in recommendations which were sent to the defendant Board and considered by it." (P. 357.)

So in this case, under its policy the city commission stands ready to hear anything new, but declines to rehear evidence or arguments which have already been presented. We find nothing objectionable in such a procedure.

Plaintiffs' fourth argument going to arbitrariness is their assertion that a person buying land in reliance thereon has some sort of right to a continuation of the existing zoning. Although they do not specifically claim a vested right in the constitutional sense, this seems to be the thrust of their contention. The contention is rebutted by the cases cited by the trial court in its memorandum,

quoted above. In addition, two of our own cases lead us to the same conclusion as that reached by the trial court.

The first is the landmark *Ware v. City of Wichita*, supra. In that case Ware owned a lot unencumbered by any zoning restrictions and proposed to erect a business building. The city refused to issue him a building permit because it was in the process of developing a comprehensive zoning plan. He brought a mandamus action to compel the issuance of the permit and was successful in that suit.

In the meantime the city proceeded to develop its zoning plan. Soon after the conclusion of the first suit it adopted the plan, under which Ware's property was zoned so as to prohibit his projected business building. The city promptly brought an action to enjoin construction of the building and secured a temporary injunction. Ware appealed, claiming the ordinance unconstitutionally impinged on his vested rights in the property. This court rejected the argument. After first observing that the ordinance was enacted before Ware had done "anything substantial towards the construction of the proposed building," the court went on to say of the ordinance:

". . . It did not bar buildings already built or prevent the completion of buildings partly constructed, but did provide that buildings not then substantially in course of construction and all those thereafter to be erected would have to conform to its terms. Such municipal legislation is not invalid, and the fact that the defendant had applied for a permit, and that his right thereto as of the date of his application had been adjudicated in his favor, did not prevent the new ordinance, when it was enacted, from governing the situation. [Citation omitted.] The permit was not issued; it has not yet been issued; and the passage of the ordinance altered the status of defendant's right thereto. [Citation omitted.] Even if the permit had been actually granted, it could have been revoked after the passage of the ordinance, if done with reasonable promptness and before the situation had been materially changed to the prejudice of the defendant." (*Id.*, 113 Kan. at 157.)

The court went on to hold that any diminution in the value of the property as a result of the ordinance was immaterial, for "[i]t often happens that a valid exercise of the police power has such effect." (*Ibid.*) The same considerations apply here. Plaintiffs have taken no action to develop the property and have not changed their position in reliance on the previous zoning beyond the initial step of purchase. In this respect their situation is no different than that of an original owner (or that of Ware) who may find an inchoate scheme for development dashed on the rocks of zoning. Our statutory scheme, in K. S. A. 1974 Supp. 12-709, protects "existing uses" from subsequent zoning but it does not protect either existing zon-

ing or merely anticipated uses. Plaintiffs must be presumed to have been aware of that when they bought their property.

Had plaintiffs developed their property for commercial uses or even taken any substantial steps toward such development we would have an entirely different lawsuit. It might then be akin to the second Kansas case we find persuasive, *Spurgeon v. Board of Commissioners,* 181 Kan. 1008, 317 P. 2d 798. In that case this court upheld a Shawnee county zoning resolution which required the removal within two years of auto wrecking yards located in residential zones, even though they were lawful prior nonconforming uses. The two year period was held reasonable in view of the owner's capital investments, and the resolution was held to be a valid exercise of the police power as against the landowners' claim that they were being deprived of their property without due process of law. It appears to us that if a governing body can constitutionally zone an existing business out of existence, it can surely zone against a use which is merely contemplated at some indefinite time in the future.

We conclude that plaintiffs had no constitutional right to the continuation of the zoning existing at the time they purchased their land.

Plaintiffs' third point on appeal is that the zoning ordinance is "invalid on its face since it recites 'having received a recommendation from the Planning Commission' when in fact, the Planning Commission recommended against its passage." The point is without merit, as the trial court noted. The statute (12-708) makes a "recommendation" from the planning commission a prerequisite to a change in zoning. It provides: "A vote *either for or against* an amendment by a majority of all of the planning commissioners present *constitutes a recommendation* of the planning commission." (Emphasis added.) In this case there was a vote against the amendment by a majority of all the planning commissioners present. There was, therefore, by statutory definition a "recommendation" and the ordinance quite correctly recited that the city commission had received one.

The judgment is affirmed.

APPROVED BY THE COURT.