NOT DESIGNATED FOR PUBLICATION

No. 118,052

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

SECHREST, LLC,
*Appellant*,

v.

CITY OF ANDOVER, KANSAS,
*Appellee*.


MEMORANDUM OPINION

Appeal from Butler District Court; MICHAEL E. WARD, judge. Opinion filed September 28, 2018. Reversed and remanded with directions.

*Robert W. Kaplan*, of Klenda Austerman, L.L.C., of Wichita, for appellant.

*David G. Seely*, of Fleeson, Gooing, Coulson & Kitch, L.L.C., of Wichita, for appellee.


Before ARNOLD-BURGER, C.J., ATCHESON, J., and LORI BOLTON FLEMING, District Judge, assigned.


PER CURIAM: When reviewing a zoning authority's decision to deny a petition to change zoning, the reviewing court presumes that the zoning authority acted reasonably. The landowner has the burden to prove that the zoning authority acted unreasonably. *Combined Investment Co. v. Board of Butler County Comm'rs*, 227 Kan. 17, 28, 605 P.2d 533 (1980). Sechrest, LLC (Sechrest) petitioned the City of Andover (City) to modify a planned unit development to allow two homes to be built on a portion of open space surrounding an existing golf course. The Andover City Council (Council) voted on the application and—after two tries following two recommendations to grant the zoning

1

application from the Andover City Planning Commission (Commission) and City staff—tied. Therefore, the zoning application was denied.

Sechrest sought review by the district court arguing that denial of its zoning request was unreasonable for several reasons. The district court found the City's action reasonable and Sechrest appeals. Because we find denial of the zoning modification to be unreasonable, we reverse the district court's decision and order the zoning modification.

FACTUAL AND PROCEDURAL HISTORY

In 1985, the City established the Terradyne Planned United Development (Terradyne PUD). Planned unit development (PUD) is a particular zoning classification in the City's zoning code. These developments are meant to promote large scale unified land development. "The PUD District operates as an overlay zone in conjunction with all of the other districts in that it is necessary for an area to concurrently be zoned for one or more of the other districts in addition to the PUD District designation." Code of the City of Andover, Appx. C, Art. 4-116 (adopted by Andover City Ordinance 1496 October 1, 2011). The PUD is established by city ordinance. Code of the City of Andover, Appx. C, Art. 4-116(A)(1); see also K.S.A. 12-755(a)(1).

A PUD ordinance can be modified after initial adoption.

"A PUD District ordinance or an approved preliminary or final PUD plan may be amended by the Governing Body, but only after a public hearing has been held . . . and findings of fact and recommendations have been prepared by the Planning Commission and transmitted to the Governing Body . . . . To further the mutual interest of the residents and owners of the PUD and of the public in the preservation of the integrity of the plan, as finally approved, and to insure that modifications, if any, in the plan shall not impair the reasonable reliance of the said residence and owners upon the provisions of the plan, nor result in changes that would adversely affect the public interest, the

2

enforcement and modification of the provisions of the plan as finally approved, whether recorded by final plan, covenant, easement or otherwise, shall be subject to the provisions provided for in K.S.A. 12-732." Code of the City of Andover, Appx. C, Art. 4-116(G).

The Terradyne PUD includes a golf course and detached single family residences. Its underlying zoning has always remained R-2, for medium density, single family residential units for the area at issue in this case. Code of City of Andover, Appx. C, Art. 4-102(A).

In 2006, an amendment was made to the Terradyne PUD to decrease the number of single-family dwelling units from 108 to 101 units in the R-2 district and add business and professional offices, including a hotel and conference center to the list of proposed uses. Although approved, the new uses have not yet come to fruition. At the time of the application at issue here, there was a townhouse development under construction with a parcel next to it not yet developed.

In 2015, Sechrest filed an application to modify the Terradyne PUD to convert a small portion of the area designated as the golf course to a new parcel which would allow two additional single-family dwellings to be built. The Commission met in July 2015 to consider the proposed amendment. It received oral or written comments from 10 people, several of whom identified themselves as residents of Terradyne. All were opposed. After receiving public comment, the Commission considered and made findings on 17 different factors, as required by the Zoning Regulations of the City of Andover. The Commission recommended that the proposed change to the Terradyne PUD should be approved.

The Council considered the application in August 2015. The Mayor recused himself from the discussion and vote due to a personal interest in the situation. Apparently, he had been in discussions with the owner to buy at least one and perhaps both parcels. With the Mayor's recusal there were six people remaining to vote on the

3

application, two of which lived in the Terradyne PUD. The Council heard public comments. An untimely protest petition, signed by 106 individuals—again primarily residents of the Terradyne PUD—was filed the night of the meeting. A motion was made to approve the Commission's recommendation and allow the change to the Terradyne PUD. The vote tied 3-3 and the motion failed. See Code of the City of Andover, Appx. C, Art. 11-104 (majority of a council necessary to adopt a zoning ordinance after returned from Commission).

At the next Council meeting in September 2015, the Council unanimously voted to return the application to the Commission for specific information on the 17 factors that it is statutorily required to consider. The Commission reconsidered the 17 factors and made more specific findings on some factors after hearing input from the applicant and the public. The Commission again recommended that the proposed change to the Terradyne PUD be approved.

In October 2015, the Council met again to discuss the proposed Terradyne PUD ordinance. The Mayor again recused himself and comments were heard from various members of the community. After considering the Commission's renewed recommendation and the public comments, the Council's vote again tied 3-3 and the zoning request failed. Councilmembers Quentin Coon, Caroline Hale, a resident of the Terradyne PUD, and Sheri Geisler voted no. During the meeting several council members and the City Attorney specifically referred to the 17 factors that must be considered, although no written analysis was provided, presumably because there was no majority opinion.

Sechrest appealed the Council's decision to the district court. Sechrest claimed that the Council's failure to approve the amendment was "unlawful, unreasonable, arbitrary and capricious." When asked to clarify its claim, Sechrest stated that the Council's vote was based on impermissible plebiscite. In other words, Sechrest argued that the Council

4

failed to consider the proper zoning factors and instead adopted the public sentiment expressed by a vocal majority. The City moved for summary judgment. Sechrest moved for remand.

A hearing was held on the motions. At the hearing, the district court indicated that the record was unclear on the reasons Coon and Hale voted no. The judge said, "[I]t's not clear to me that [Coon and Hale] just weren't going along with what the community members wanted them to do." After the hearing was held on the motions the district court remanded the case to the Council. The district court judge found:

> "Council member Geisler simply stated her disagreement with the process utilized by the City of Andover in considering the zoning application rather than stating the substantive grounds for her no vote. Council members Coon and Hale made comments suggesting that their votes were based on just going along with what the community members wanted them to do."

The judge went on to say that he was "concerned that the record is not sufficiently clear regarding the reasons for the votes against and in favor of the motion to rule out the possibility that one or more votes were the result of impermissible plebiscite."

The district court judge gave two options on remand. First, the Council could conduct a new vote with current Council members (which included some new members) regarding whether to adopt the Commission's recommendation. Second, the members of the Council in October, including Coon who was no longer a councilmember, could provide a written statement to the court explaining the reasons behind their individual vote in October.

The Council elected to take the second option and three council members out of the six, including Hale and Geisler, provided written statements. Coon declined to provide additional information regarding his vote.

5

Hale's statement explained that she considered the 17 factors and "found no compelling evidence of change in the property or the surrounding neighborhood that would indicate justification of the requested amendment for change in land use." She also referenced restrictive covenants and her belief that "the most restrictive conditions should have priority" when zoning regulations and covenants differ.

Geisler stated that she considered the 17 factors and concluded that a change in the land use was not the most appropriate decision.

Sechrest filed a request for hearing and motion for approval of zoning, arguing that the reasons given by Hale and Geisler were inadequate to support a vote denying the change in zoning. The court heard arguments from the parties and took the matter under advisement.

The district court ultimately denied Sechrest's motion in a written order. The court reiterated that it was previously concerned that "one or several Council members may have engaged in impermissible plebiscite." The court noted that Coon and Hale made comments which suggested that their votes were based on plebiscite. The court referenced Hale and Geisler's written explanation for their votes. The court found that the written statements of Geisler and Hale sufficiently laid to rest its concerns that the Council engaged in plebiscite voting. The court did not address Coon's failure to explain his vote. The court concluded by stating that "[Sechrest] has failed to prove that the Andover City Council's tie vote . . . was arbitrary and unreasonable."

Sechrest appeals the district court's decision.

6

ANALYSIS

Sechrest's overarching argument is that the Council's actions in denying its zoning request was unreasonable and arbitrary. As a result, it is entitled to an order from this court approving its request. We will examine each of Sechrest's claims of unreasonableness in turn, but first we must set out our standard of review and some general information about the quasi-judicial role a city council plays in a zoning decision and the unique posture of this case.

*Standard of Review*

Our standard of review in a zoning case is set forth in *Combined Investment*, 227 Kan. at 28. To summarize, we must first recognize that it is the Council, not the court, which has the right to change or refuse to modify the Terradyne PUD ordinance. We must begin with the presumption that the Council acted reasonably, and Sechrest has the burden to prove the unreasonableness of the Council's action by a preponderance of the evidence. Preponderance of the evidence "means that evidence which shows a fact is more probably true than not true." *In re B.D.-Y.*, 286 Kan. 686, 691, 187 P.3d 594 (2008). Without substituting our judgment for that of the Council, we are to determine de novo, based on the facts submitted, whether the Council's action was "so arbitrary that it can be said it was taken without regard to the benefit or harm involved to the community at large, including all interested parties, and was so wide of the mark that its unreasonableness lies outside the realm of fair debate." *Combined Investment*, 227 Kan. at 28.

Moreover, because this case was decided pursuant to the City's motion for summary judgment, our review is de novo, with no deference due to the decision of the district court. *Cady v. Schroll*, 298 Kan. 731, 734, 317 P.3d 90 (2014).

7

*The Council's role in zoning decisions*

Sechrest states, without citing support, that "[i]t is axiomatic that ownership of real property entitles the owner to make beneficial use of his or her property. In the first instance, the owner has the right to select the type of use desired for enjoyment or to result in the most favorable return on investment."

Ownership of property does instill the owner with certain rights. Generally, ownership of property includes the rights of: acquisition, dominion, possession, access, *use and enjoyment*, exclusion, and disposition. 73 C.J.S., Property § 3. Kansas courts generally recognize these rights. See *In re Tax Appeal of BHCMC*, 307 Kan. 154, 166, 408 P.3d 103 (2017) (acknowledging property rights include the right to possess and use). But these rights are not unlimited.

While a property owner has the right to use his or her property as desired, that right is not absolute. For example, the property owner cannot use the land in a way that harms others or contravenes law or public policy. 73 C.J.S., Property § 4. The clearest example of this is the fact that cities can enact zoning laws which prohibit property owners from using their land in various ways. See K.S.A. 12-741 (enabling cities and counties to enact planning and zoning laws and regulations). These laws are permissible governmental action "even when prohibiting the most beneficial use of the property." *Penn Central Transp. Co. v. New York City*, 438 U.S. 104, 125, 98 S. Ct. 2646, 57 L. Ed. 2d 631 (1978).

When a city adopts a zoning plan it is exercising a legislative function. *Golden v. City of Overland Park*, 224 Kan. 591, 597, 584 P.2d 130 (1978).

"When, however, the focus shifts from the entire city to one specific tract of land for which a zoning change is urged, the function becomes more quasi-judicial than

8

legislative. While policy is involved, such a proceeding requires a weighing of the evidence, a balancing of the equities, an application of rules, regulations and ordinances to facts, and a resolution of specific issues." 224 Kan. at 597.

So just as a court reviews and weighs the facts of a case to determine a result, "zoning determinations, must be fair, open, and impartial." *Leffel v. City of Mission Hills*, 47 Kan. App. 2d 8, Syl. ¶ 9, 270 P.3d 1 (2011).

In evaluating whether a court has properly weighed the evidence and maintained its role as a neutral arbiter, a mere yes or no vote gives little guidance as to the reasons for a council's actions. Because courts must review these quasi-judicial actions for reasonableness, when denying or granting a specific zoning change a council or commission "should enter a written order, summarizing the evidence before it and stating the factors which it considered in arriving at its determination." 224 Kan. at 597. In *Golden*, our Supreme Court enumerated several factors that should be considered by a governing body in reaching its decision. 224 Kan. at 598. But it later clarified that these listed factors are not to be rigidly applied as the only factors to consider. See *Landau v. City Council of Overland Park*, 244 Kan. 257, Syl. ¶ 1, 767 P.2d 1290 (1989); see also *Davis v. City of Leavenworth*, 247 Kan. 486, 495, 802 P.2d 494 (1990).

Whatever factors are considered, they must be lawful, reasonable, and relevant to the issues raised before the governing body. They should be sufficiently detailed to allow a meaningful review.

"[S]uch findings must be factual rather than conclusory, and the application of relevant legal principles must be something more than the recital of a litany. Accordingly, the findings cannot simply repeat statutory criteria, broad conclusory statements, or boilerplate resolutions. Zoning boards of appeal or adjustment, rather, must take pains to frame their legal conclusions in language commensurate with that of the statutes they

9

enforce and to specify in their decision the facts upon which they base such conclusions."
101A C.J.S., Zoning and Land Planning § 246.

If the trial court believes the findings of the council are deficient and inadequate for a reasonableness determination, the case should be remanded to the governing authority for further findings and conclusions. *Landau*, 244 Kan. 257, Syl. ¶ 9.

*The unique situation presented here: a tie vote and failure to document reasons for its action*

The City, primarily based on the factors set out in the *Golden* decision, adopted its own zoning regulations that require both the Commission and City Council to consider 17 factors before deciding whether to adopt a change in existing zoning.

"1. What are the existing uses of property and their character and condition on the subject property and in the surrounding neighborhood?

"2. What is the current zoning of the subject property and that of the surrounding neighborhood in relationship to the requested change in zoning classification?

"3. Is the length of time that the subject property has remained undeveloped or vacant as zoned a factor in the consideration for a change in zoning?

"4. Would the requested change in zoning correct an error in the application of these regulations as applied to the subject property?

"5. Is the change in zoning requested because of changed or changing conditions in the area of the subject property and, if so, what is the nature and significance of such changed or changing conditions?

"6. Do adequate sewage disposal and water supply and all other necessary public facilities including street access exist or can they be provided to serve the uses that would be permitted on the subject property if the change in zoning was approved?

"7. Would the subject property need to be platted or re-platted or in lieu of dedications made for rights-of-way, easements, access control or building setback lines if the change in zoning was approved?

10

"8.      Would a screening plan be necessary for existing and/or potential uses of the subject property if the change in zoning was approved?

. . . .

"9.      Is the general amount of suitable vacant land or buildings available or not available for development that currently has the same zoning district classification as is requested for the subject property?

"10.     In the event that the subject property is requested for business or industrial uses, are such uses needed to provide more services or employment opportunities?

"11.     Is the subject property suitable for the current zoning to which it has been restricted?

"12.     If the change in zoning were approved, would the uses, which would be permitted on the subject property, be compatible with the uses permitted on other property in the neighborhood?

"13.     Would the change in zoning as requested be consistent with the purpose of the zoning district classification and the intent and purpose of these regulations?

"14.     Is the request for the zoning changes in conformance with the Comprehensive Plan and does it further enhance the implementation of the Plan?

"15.     What is the nature of the support or opposition of the requested change in zoning?

"16.     Are there any informational materials or recommendations available from professional persons knowledgeable on this request which would be helpful in its evaluations?

"17.     Does the relative gain to the public health, safety and general welfare outweigh the loss in value or the hardship imposed upon the applicant by not approving the requested change in zoning?" Code of the City of Andover, Appx. C, Art. 11-100(H).

Moreover, "[o]f those factors considered as relevant to the requested change in zoning district classification or boundary, not all factors need to be given equal consideration by the Commission in deciding upon its recommendation." Code of the City of Andover, Appx. C, Art. 11-100(H)

11

Upon presentation of the Commission's analysis of these 17 factors,

> "[T]he City Council shall take into account the guidelines in Section 11-100H which are relevant to the proposed amendment or special use and, having reviewed the Commission's findings of fact and the factors upon which their recommendation is based, the City Council either adopts the Commission's findings and factors by reference *or records their own findings of fact and the factors upon which their decision is based*." (Emphasis added.) Code of the City of Andover, Appx. C, Art. 11-104.

In this case, rather than the four votes required for passage of an ordinance, the Council tied 3-3. It did not record any findings of fact or conclusions regarding the factors upon which its decision was based—apparently because it had no majority decision. We note that the Council could have complied with its own ordinance by setting out reasons relied on by each faction—the ayes and the nays. The statute clearly requires such findings any time the Council does not adopt the Commission's findings by reference.

We pause to note that the Kansas Supreme Court has held that a tie vote is not an affirmative action one way or the other. As a result, in *Olson v. City of WaKeeney*, 218 Kan. 447, 448-49, 543 P.2d 932 (1975), the court ordered an appeal of a tie vote by a city council dismissed because it was not in a posture for judicial review. In other words, it was not a final decision and the court lacked jurisdiction. But our court distinguished the facts in *Olson* in *Geelen v. Dickinson County Board of Zoning Appeals*, No. 100,794, 2009 WL 3018085 (Kan. App. 2009) (unpublished opinion), by noting that in *Olson* it was not clear whether the council's tie vote was final or whether it planned to return the matter to the planning commission. But in *Geelen* the Board of Zoning Appeals made it clear that it was not going to take the matter up again and its decision was final. In such a case, our court found that appeal was appropriate. 2009 WL 3018085, at *4. We agree with the reasoning in *Olson* and find this case to be similar. Here, the Council vote resulted in a tie and it remanded the matter to the Commission to make further findings.

12

See Code of City of Andover, Appx. C, Art. 11-104 (Council may adopt Commission recommendation, overrule it, or remand matter to Commission); see also K.S.A. 2017 Supp. 12-757(d) (same). The Commission made further findings and following the Council's reconsideration, it again tied. It was clear that the vote was final and it was not to be returned to the Commission. See Code of City of Andover, Appx. C, Art. 11-104 (upon return to Council, it may adopt, amend and adopt, or take no further action); see also K.S.A. 2017 Supp. 12-757(d) (same). Moreover, when given the option to reconsider its actions by the district court, it declined. Accordingly, we conclude we have jurisdiction to review the Council's tie vote under these circumstances as a final action by the Council. So, we return to our discussion of the reasonableness of the Council's action.

Although our Supreme Court has been clear that a City's actions are not per se unreasonable solely because the factors set out in *Golden* are not enumerated, its failure to memorialize any findings and conclusions makes it difficult for this court to review the reasonableness of its decision. See *Landau*, 244 Kan. at 263; *Golden*, 224 Kan. at 599 (reasonableness "standard will be more readily, more effectively, and more uniformly applied if zoning bodies will place in their minutes a written order delineating the evidence and the factors the board considered in arriving at its conclusion"). Here, when given the opportunity to revote and perhaps have a majority decision, the Council declined, instead resting on the record as it exists along with the supplemental rationale of only three of the six Council members.

Mindful of the presumption of reasonableness we must make as to the Council's decision but armed with little information regarding the basis for its decision, we have no other option but to independently analyze each of the statutory factors that the Council was required to consider, and the evidence related to each to determine whether a decision to deny this rezoning was reasonable.

13

*A journey through the factors enumerated in the Zoning Code of the City of Andover*

In analyzing the City of Andover's statutorily required considerations, we are guided by the record, the same record available to the district court judge when he granted summary judgment to the City. This includes the reports from the Commission and City staff, a transcript of the final Council meeting, various letters sent to the Council and the Commission from members of the public, meeting minutes which also include summaries of those who spoke in support and opposition, and all motions and responses from the parties as well as transcripts of the hearings before the district court.

Whether the Council's action was reasonable is a question of law to be determined upon the basis of the facts which were presented to the Council. *Davis*, 247 Kan. at 498. So we will begin by an examination those facts as we journey through the statutorily mandated factors that the city ordinance requires the city staff, the Commission, and the Council to consider. See *Landau*, 244 Kan. at 264 ("embark[ing] on an analytical journey, pausing at each *Golden* factor way station" to determine whether property owner sustained his burden). We note that at each Commission meeting during which the amendment to the Terradyne PUD was considered, the Commission specifically noted its position and that of City zoning staff on each of the 17 statutory factors. Although in the 2006 Terradyne PUD amendment request the Council specifically ruled on each of these same factors as part of its decision, we are unable to find anywhere in the record where the Council went through a similar analysis here. This is in spite of the fact that the City's own ordinance requires the Council to record the findings of fact and the factors upon which its decision is based if it is contrary to that of the Commission. Code of the City of Andover, Appx. C, Art. 11-104.

## 1. *The character of the neighborhood*

The character of the neighborhood is residential with a golf course. The Terradyne PUD and the land on all sides of it is zoned residential. The rezoning request was to add two residential lots for detached single family residences, equal to or greater in value than the other residences in the area. The Commission and City staff concurred in this finding. The Council made no findings on this factor that we are able to locate in the record, although it did concur with a similar analysis of the character of the neighborhood in 2006. Nothing appears in the record that supports any conclusion contrary to that of the Commission and City staff. We find that this factor weighs in favor of granting the request.

## 2. *Zoning and uses of nearby property*

The Terradyne PUD and the land on all sides of it is zoned residential. The rezoning request was to add two residential lots for detached single family residences, equal to or greater in value than the other residences in the area. There would be no need to change the underlying zoning from R-2 residential with this request. The Commission and City staff concurred in this finding. The Council made no findings on this factor that we are able to locate in the record, although it did concur with a similar analysis of the character of the neighborhood in 2006, when two sides contained either vacant property or agricultural uses. Nothing appears in the record that supports any conclusion contrary to that of the Commission and City staff. We find that this factor weighs in favor of granting the request.

## 3. *Length of time the subject property has remained vacant as zoned*

This factor asks the question whether the length of time that the subject property has remained undeveloped or vacant as zoned was a factor in consideration. The

Commission and City staff concluded this was not a factor. This particular piece of property has never been developed. Again, the Council made no specific finding as to this factor. This factor is neutral as to granting or denying the request.

### 4. Correct an error

This factor asks whether the rezoning request is to correct an error in the application of the Andover zoning regulations. The Commission and City staff all agreed that this was not a factor. The Council made no specific finding as to this factor. This factor is neutral as to granting or denying the request.

### 5. Change in conditions

This factor asks whether the request is caused by changed or changing conditions in the area. The Commission and City staff agreed that this was not a factor at the first Commission meeting. But at the second Commission meeting, after further discussion, the Commission disagreed with City staff and noted that there was a current market demand to use the unused part of the golf course for residential housing. The Council made no specific finding as to this factor. Nothing appears in the record that supports any conclusion contrary to that of the Commission. We find that this factor weighs in favor of granting the request.

### 6. Adequate public facilities

This factor asks whether "adequate sewage disposal and water supply and all other necessary public facilities including street access exist" or can be provided "to serve the uses that would be permitted on the subject property?" The Commission and City staff answered this in the affirmative. The City staff indicated that water and streets are in place and adequate and sewers could be easily extended to the site. The necessary

infrastructure was in place. This was not identified as an impediment to amending the Terradyne PUD. The Council made no specific finding as to this factor. Nothing appears in the record that supports any conclusion contrary to that of the Commission and City staff. We find that this factor weighs in favor of granting the request.

### 7. *Necessity of platting*

This factor asks whether the subject property would "need to be platted or re-platted or in lieu of dedications made for rights-of-way, easements, access control or building setback lines?" The Commission and City staff answered this in the affirmative. Because Sechrest was dividing a parcel of land into two or more lots or parcels, it must comply with the Subdivision Regulations of the Code of the City of Andover, Appx. D, Art. 1-104. Engineers would have to replat the existing parcel into two residential lots which could result in a separate and distinct hearing. Code of the City of Andover, Appx. D, Art. 4-103. This was not identified as an impediment to amending the Terradyne PUD. Interested persons would have an opportunity to provide input to the Commission and the Council concerning the plat. Code of the City of Andover, Appx. D, Art. 4-103.

By June 2015, Sechrest had already started the replatting process, contingent on the granting of its requested amendment to the Terradyne PUD. Letters were in the file indicating that Westar Energy would not need additional easements, nor were there any concerns regarding the plat from Rural Water District #5, Kansas Gas Service Company, or AT&T. Approval from the Andover Subdivision Committee of the revised plat had been obtained and was in the record on appeal. The Council made no specific finding as to this factor. Nothing appears in the record that supports any conclusion contrary to that of the Commission and City staff. We find that because Sechrest had already received preliminary approval of the replatting with no impediments identified, this factor weighs in favor of granting the request.

17

### 8. Necessity of screening plan

This factor questions whether a screening plan would be necessary to screen the property from existing uses or future uses of property in the area. The Commission and City staff answered this in the negative. Screening would not be required from the other single family residential properties in the area. Nothing appears in the record that supports any conclusion contrary to that of the Commission and City staff. We find that this factor weighs in favor of granting the request.

### 9. Amount of available land

This factor questions the availability of suitable vacant lands or buildings that currently have the same zoning as that requested by the applicant. The Commission and City staff found this factor to be inapplicable at its first meeting because it is an infill area not currently being used by the golf course. But at the second meeting the Commission noted affirmatively that there were no other suitable lands available on a golf course for this development. The Council made no specific finding as to this factor. Nothing appears in the record that supports any conclusion contrary to that of the Commission. We find that this factor weighs in favor of granting the request.

### 10. Need for business or industrial uses

This factor only applies when the request is for business or industrial uses. Because this is a request for a residential use, the Commission and City staff found this factor to be inapplicable. The Council made no specific finding as to this factor. Because this factor is inapplicable, it is neutral as to granting or denying the request.

## 11. *Current use consistent with the zoning district classification*

This factor asks whether the request is consistent with the zoning to which it has been restricted. The Commission and City staff answered this in the affirmative. The property was already zoned for single family residential and that was consistent with the use proposed. The Council made no specific finding as to this factor. Nothing appears in the record that supports any conclusion contrary to that of the Commission and City staff. We find that this factor weighs in favor of granting the request.

## 12. *Extent to which the change will detrimentally affect nearby property*

This factor asks to what extent would removal of the restrictions, i.e., the approval of the zoning request detrimentally affect other property in the neighborhood? The Commission and City staff took the position that there would be no detrimental effect because the property is already zoned as single-family. The second time the Commission considered the matter it explicitly found that the value of the neighboring homes would not be lowered by this change and in fact with the addition of these two homes, home values may increase. Commissioner Brian Lindebak commented that this would be less than a 1% change to the Terradyne PUD. Commissioner Mike Warrington noted that on the original plat the area involved in this amendment was never labeled to remain green space or open space. The Council made no specific finding as to this factor. Nothing appears in the record that supports any conclusion contrary to that of the Commission and City staff. We find that this factor weighs in favor of granting the request.

## 13. *Proposed use consistent with zoning classification and regulations*

As opposed to factor 11 which deals with the *existing* use, this factor questions whether the *requested* use would be consistent with the purpose of the zoning classification and the intent and purpose of the zoning regulations. The Commission and

19

City staff answered this in the affirmative. The proposed used is identical to the existing use. The Council made no specific finding as to this factor. Nothing appears in the record that supports any conclusion contrary to that of the Commission and City staff. We find that this factor weighs in favor of granting the request.

### 14. *Conformance with the City's comprehensive plan*

This factor inquires whether the request is in conformance with the City's Comprehensive Plan and whether it further enhances the implementation of the Plan. The Commission and City staff answered this in the affirmative. Again, the Comprehensive Plan is for single-family residential and the request is for single-family residential. The Council made no specific finding as to this factor. Nothing appears in the record that supports any conclusion contrary to that of the Commission and City staff. We find that this factor weighs in favor of granting the request.

### 15. *Nature of the support or opposition to the request*

This factor focuses on the "nature of the support or opposition of the requested change." The City staff noted that at least at the time it reviewed the plan there was no public support or opposition. The Commission heard from both opponents and proponents over the course of two separate hearings. It noted both times that the opposition was focused on aesthetics, primarily related to an obstruction of the view, not the lowering of property values. The Commission did not identify the arguments of the opposition as an impediment to amending the Terradyne PUD. We will summarize the positions of the respective parties.

20

*a. The opposition*

Throughout the rezoning process in this case, there were several consistent opponents who gave reasons for their opposition—all residents of the Terradyne PUD. There were others who indicated their opposition but gave no reason that we can discern from their comments. We can summarize the opposition as follows.

Homeowners in the Terradyne PUD were told when they bought their homes that the subdivision would be limited to 108 residences, later reduced to 101 residences, and they have relied on that promise. They believe the owner of the tract should be bound by that promise as well. Increasing that amount to 103 would be unreasonable. They enjoy the ambience of the open space and natural grass where these houses would be built. A few neighbors contend that these homes will obstruct the view of the golf course from their residences. Over the years, the Terradyne Homes Association has invested money in maintaining the vacant lot at issue here and has received no financial support from the owners of the land and the Terradyne Country Club (Club) in these endeavors. In addition, they fear that adding two more residences is just the beginning. The owner will start chipping away at the golf course in order to reach its financial goals. They worry about the construction traffic while the homes are being built. A total of 18 homeowners, representing 15 homes, have either spoken to the Council or submitted letters stating their opposition to an amendment of the Terradyne PUD. In addition, a petition was presented with 106 signatures all in opposition, representing an additional 60 homes in the Terradyne PUD.

*b. The proponents*

There were also several homeowners and community members who spoke or wrote in support of the amendment to the Terradyne PUD. Their concerns can be summarized as follows.

When the Terradyne residential development was built, there was no requirement that the residents be Club members. About 70% of the residents are not dues paying members, even though they enjoy the views and the increased property values associated with residing on or near a golf course. As a result, over the years, the Club has struggled through several owners. Its upkeep and maintenance has seen highs and lows over the years. The cost of water has increased well beyond what has routinely been budgeted for that expense. Sechrest bought the Club and the land from a bank, apparently as a result of the prior owner's bankruptcy. The owners that make up Sechrest have tried to improve the Club, but part of the financing includes a plan to replat the 1.6 acre vacant lot at issue here into two homesites for homes valued at around $400,000. This influx of cash will not only help the owners maintain the Club in a way that will allow the surrounding homeowners to maintain or increase their property values, but will provide tax revenue for the city, county, state, and school district. In addition, the streets will not be impacted and the use is consistent with the zoning for the tract. In 2006, the Council approved an amendment to the Terradyne PUD in spite of a petition objecting from 225 people that included plans for a hotel behind the clubhouse, blocking the sun to several residences. To deny this minimal change to the Terradyne PUD, consisting of only two additional homes that will provide needed income to maintain the beauty of the golf course and Club, is hypocritical and unreasonable. A total of 17 homeowners or community members have spoken or written in support of the amendment to the Terradyne PUD.

The Council did discuss the position of the residents at the final hearing. It appears that three Councilmembers gave great weight to this factor and three Councilmembers did not believe that the opposition was sufficient to deny the application. Because of the prominent role this factor appeared to take in the eyes of those who voted against the amendment it will be discussed in more detail later, when we discuss Sechrest's allegations of unreasonableness.

*16. Opinion of knowledgeable persons or experts*

This factor asks the entity to determine if there are any informational materials or recommendations available from knowledgeable persons or experts which would be helpful in its evaluation. The Commission responded that there was nothing additional needed that would be helpful to its evaluation of the application. It has already seen and heard a lot of information. City staff indicated that as the professional staff it had no objection to the amendment to the Terradyne PUD. The Commission approved the application both times it heard it. The first time by a 3-2 vote, with two commissioners absent. Upon remand from the Council, the Commission voted 6-1 for approval. Nothing appears in the record that supports any conclusion contrary to that of the Commission and City staff on this factor.

We recognize that the mere fact that the Commission approved the rezoning request does not automatically make the Council's decision to deny it arbitrary. See *Houston v. Board of City Commissioners*, 218 Kan. 323, 330, 543 P.2d 1010 (1975). But it is one of the factors to consider. But we find that to the extent that both the City's professional zoning staff and the Commission recommended the requested amendment, with none of the Commission's findings specifically disputed by the Council, this factor weighs in favor of granting the request.

*17. Gain to the public health, safety, and welfare versus the loss in property value or hardship to applicant*

The final factor for consideration focuses on whether "the relative gain to the public health, safety and general welfare outweigh the loss in value or the hardship imposed upon the applicant by not approving the requested change in zoning." The Commission answered this in the negative. It had already noted its position that there would be no detriment to the public and that market conditions supported the

23

development of the land. See factors 5, 9, and 12. Nothing appears in the record that supports any conclusion contrary to that of the Commission and City staff. We find that this factor weighs in favor of granting the request.

*The Council's position in failing to approve the requested amendment was unreasonable.*

To determine whether Sechrest has met its burden to establish the unreasonableness of the Council's position by a preponderance of the evidence, we first examine the Council's decision and the reasons stated by the councilmembers.

1. *The Nays*
   a. *Councilmember Quentin Coon*

At the meeting, Councilmember Coon expressed his concern that allowing the change would chip away at the quality of the development. He also stated, "[I]t seems like the residents want to maintain the character and quality of their development." When asked how he reached his decision that the proposed amendment would degrade the Terradyne PUD, Coon said "Well, I don't live there. I do accept the resident's opinion." Coon specifically referenced one of the factors the Commission and Council were to consider before making a decision, factor 15, the nature of the support or opposition to the request. See Code of the City of Andover, Appx. C, Art. 11-100(H)(15). Coon made additional comments that referred to listening to the residents of the Terradyne development. Coon voted no on the proposed amendment. He elected not to present any additional explanation to the district court.

   b. *Councilmember Caroline Hale*

Councilmember Hale, a resident of Terradyne, believed that the developer should have met with the residents of Terradyne in advance and heard their thoughts and

concerns. She also stated that the residents had personally invested in improving the area at issue because the golf course owner had not done so. She believed that their investment was why many felt so strongly against changing the land to residential land. Hale also voted no on the proposed amendment.

When given an opportunity to expand on her rationale, Hale stated that she had thoroughly considered all 17 factors and found no compelling reason to change the existing zoning. She also indicated that when local zoning ordinances and private deed restrictions differ, the most restrictive conditions should prevail. We are unclear as to the meaning of this statement and its stated justification for Hale's position. We could locate no evidence in the record regarding private deed restrictions on the property that is the subject matter of the rezoning or any of the properties in the Terradyne PUD.

### c. Councilmember Sheri Geisler

Councilmember Geisler expressed concern with the zoning change process and transparency. Geisler also voted no on the proposed amendment. When given an opportunity to expand on her rationale, Geisler indicated that she examined the 17 factors and did not believe "a change of land use was the most appropriate decision."

### 2. The Ayes
### a. Councilmember Kris Estes

Councilmember Estes indicated that she had followed this rezoning closely and felt that the change to the zoning would benefit the City more than it would be detrimental to the residents. Estes voted yes on the proposed amendment. She elected not to submit any additional explanation to the district court.

### b. Councilmember Clark Nelson

Councilmember Nelson, also a resident of the Terradyne PUD, indicated that he was not concerned about the current request setting a precedent for slowly chipping away at and degrading the Terradyne PUD. He believed every zoning case is unique and should be decided on its individual merits. In addition, he did not think this proposal was degrading the Terradyne PUD. This lot was the only lot left to develop on the tract and this was the only viable use for it. Nelson voted yes on the proposed amendment.

When given an opportunity to expand on his rationale, Nelson indicated that each and every one of the 17 factors "considered fairly and objectively" lead to the conclusion that the zoning should be approved. He noted that he believed his colleagues that voted no did so only because of the opposition from some neighbors. As to that factor, he noted that the neighbors in favor of approval were equally as substantial and significant.

### c. Councilmember Troy Tabor

Councilmember Tabor disputed that there was ever an agreement to keep the number of single family units in the Terradyne PUD at 101. He indicated that the original approval was for 108 units. He did not see this as a unique situation, noting that developers frequently seek to add or remove lots and it is usually related to money. Tabor voted yes on the proposed amendment. He elected not to present any additional explanation to the district court.

*Our conclusion*

Sechrest argues that we must throw out the nay votes on the basis that they were the result of impermissible plebiscite voting and approve the rezoning request. We share Sechrest's concern, that particularly Councilmember Coon and, more likely than not,

26

Councilmembers Hale and Geisler as well, placed the desires of the neighbors above those of the applicant and the community at large and thereby relinquished their role as neutral arbiters of re-zoning applications. "Neighborhood objections are not legally sufficient to deny use, or even conditional uses, of land. However, it remains a consideration in the ultimate decision." *Gump Rev. Trust v. City of Wichita*, 35 Kan. App. 2d 501, 511, 131 P.3d 1268 (2006). "Zoning is not to be based upon a plebiscite of the neighbors, and although their wishes are to be considered, the final ruling is to be governed by consideration of the benefit or harm involved to the community at large." *Waterstradt v. Board of Commissioners*, 203 Kan. 317, Syl. ¶ 3, 454 P.2d 445 (1969). This court has explained "impermissible plebiscite occurs when the zoning board relinquishes its quasi-judicial role to adopt the public sentiment expressed by a vocal majority." *Leffel*, 47 Kan. App. 2d at 25.

But we do not have to decide this case based upon whether the three votes were the result of plebiscite voting, because when we examine all the evidence presented, without substituting our judgment for that of the Council, we have no trouble finding that the Council's action in denying Sechrest's requested rezoning was "so arbitrary that it can be said it was taken without regard to the benefit or harm involved to the community at large, including all interested parties, and was so wide of the mark that its unreasonableness lies outside the realm of fair debate." *Combined Investment*, 227 Kan. at 28. In our painstaking review of each of the 17 factors, we have concluded that there is absolutely no evidence to support a denial of this rezoning under *any* of the 17 factors.

After a thorough review of the record submitted to us, there is little room for dispute that the primary consideration demonstrated by those who voted nay was neighborhood opposition. Although two stated in their supplemental explanation that they considered all 17 factors and found no reason to change the existing zoning, this is wholly conclusory and gives us no additional information regarding compliance with their quasi-judicial role—which requires that they be fair, open, and impartial. But that

27

does not end our analysis. "[C]onsideration of the opinions of neighboring property owners is permissible in a zoning decision, so long as the consideration of such opinions is relevant to establishing the existence or absence of one of the regulatory factors governing the zoning decision. *Leffel*, 47 Kan. App. 2d at 19. So we must examine whether the opposition was based on any of the 17 statutory factors.

As far as we can ascertain from the record on appeal, the neighborhood opposition focused on four things.

First, some homeowners expressed their dissatisfaction, with Sechrest and prior owners of the golf course and Club, regarding upkeep of the tract without any reimbursement from Sechrest or its predecessors. The homeowner's association had paid for upkeep for at least portions of the disputed tract in the past. But the fact remains that the homeowner's association had no ownership interest in the tract and their upkeep was to ensure that the tract remained aesthetically pleasing. A monetary dispute between the developer and the existing landowners is not a valid reason to deny a rezoning request or a listed factor to consider under the Andover Zoning ordinance. Even though the factors are not exclusive, to allow the Council to consider such disputes would result in the Council taking sides in the dispute. In response to this concern, a representative from Sechrest pointed out, and City staff confirmed that if the tracts were redeveloped with single family homes it would be the homeowner's responsibility to keep up the property, apparently relieving the homeowner's association of any need to do it.

Second, some homeowners indicated they did not want a change because they enjoy the current ambience of the open space and natural grass where these houses would be built. Kansas courts recognize that aesthetics may be considered when deciding whether to grant or deny a petition to change zoning. *Zimmerman v. Board of Wabaunsee County Comm'rs*, 289 Kan. 926, Syl. ¶ 6, 218 P.3d 400 (2009). But even aesthetic considerations "must be carefully reviewed to assure that they are not just a vague

28

justification for arbitrary and capricious decisions." *Gump Rev. Trust*, 35 Kan. App. 2d at 512.

We have no doubt that the opponent neighbors were sincere in their desire to maintain the status quo of open space and natural grass, but they presented no evidence to support an objective finding that the proposed $400,000 homes would be an eyesore, lower their property values, or in any way be detrimental to the Andover community at large.

Third, some homeowners expressed the fear that this request was merely the camel's nose under the tent. In other words, it was a small innocuous zoning change that would open the way for larger, undesirable zoning requests. But just as a court must consider the case presented to it, the Council is required to consider the rezoning request before it on its merits and not base its decision on anticipation of what may come in the future. In *Golden*, the Supreme Court warned about the danger of a governing body relying on such general considerations as "'likely to have a domino effect'" to control zoning decisions. 224 Kan. at 596. "Protests, of course, may be considered; but protests against uses not proposed are not entitled to great weight." 224 Kan. at 600. There does not appear to be any legal basis to deny a rezoning request because of a fear of future rezoning requests.

Finally, some neighboring homeowners were concerned about construction traffic that would occur while the homes were being built. Traffic considerations could be a factor to consider in a rezoning if the rezoning itself will significantly affect traffic patterns in the area or disproportionally increase traffic congestion in the area. But these types of conclusions must be based on reliable experts and not mere speculation. See *Taco Bell v. City of Mission*, 234 Kan. 879, 891, 678 P.2d 133 (1984.) Again, in *Golden*, the Supreme Court warned about the danger of a governing body relying on such general considerations as "'traffic problems'" to control zoning decisions. 224 Kan. at 596.

29

Moreover, the concerns expressed by a few neighbors here was not a permanent traffic problem that would be a direct consequence of the rezoning, but a temporary problem related to the short amount of time it would take to construct the two homes. This is not a basis to deny a rezoning request.

In sum, after considering all the evidence, we hold that Sechrest has met its burden of proof and established by a preponderance of the evidence that the Council's action in denying the Terradyne PUD was so arbitrary that it can be said it was taken without regard to the benefit or harm involved to the community at large, including all interested parties, and was so wide of the mark that its unreasonableness lies outside the realm of fair debate. See *Combined Investment*, 227 Kan. at 28. So we next turn to the remedy.

*The extraordinary remedy of ordering the Council to approve the amendment to the Terradyne PUD is appropriate.*

The City argues that if the court finds the Council's action to be unreasonable, it still lacks the power to force the City to approve the petition to change zoning. Contrary to the City's position, precedent shows that a court may order a zoning board to approve an application in some circumstances particularly when there is a finding that the Council's action was unreasonable. See *Jack v. City of Olathe*, 245 Kan. 458, 459, 781 P.2d 1069 (1989); *Combined Inv.*, 227 Kan. at 25, 31; *Blessant v. Board of Crawford County Comm'rs*, No. 89,916, 2003 WL 23018238, at *1-4 (Kan. App. 2003) (unpublished opinion). We find this to be the only meaningful remedy we can provide in this case. Sechrest has met its burden to establish by a preponderance of the evidence that the decision to deny its rezoning request was unreasonable. The Council has already declined to enter specific findings and has declined to revote, both options provided to it. Accordingly, we view it as a futile act to do anything at this time other than reverse the district court's decision and order the Council to approve Sechrest's requested amendment to the Terradyne PUD.

Reversed and remanded with directions.